# Illinois Official Reports

## Appellate Court

*People v. Harmon*, 2013 IL App (2d) 120439

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RYAN T. HARMON, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-12-0439 |
| Filed | October 28, 2013 |
| Rehearing denied | December 24, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The summary dismissal of defendant's postconviction petition alleging 11 claims, including the ineffective assistance of his trial and appellate counsel, the admissibility of fingerprint evidence and the unconstitutionality of the exclusive-jurisdiction provision of the Juvenile Court Act, was upheld, since the allegation that an alibi witness was not investigated and called to testify was frivolous and patently without merit, the result of the trial would not have been different even if the fingerprint evidence had been excluded, and the provisions of the Juvenile Court Act treating 17-year-olds charged with felonies as adults does not violate the eighth amendment or due process. |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 06-CF-2363; the Hon. John R. Truitt, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Alan D. Goldberg and Brian E. Koch, both of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Joseph P. Bruscato, State's Attorney, of Rockford (Lawrence M. Bauer and Aline Dias, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | |
| Panel | JUSTICE SPENCE delivered the judgment of the court, with opinion. Justices McLaren and Hutchinson concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a jury trial, defendant, Ryan T. Harmon, was convicted of three counts of aggravated kidnaping (720 ILCS 5/10-2(a) (West 2006)) and one count of arson (720 ILCS 5/20-1(a) (West 2006)). Defendant later filed a petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)), which the trial court dismissed at the first stage of proceedings. On appeal, defendant challenges the trial court's summary dismissal of his postconviction petition. Defendant argues that the petition presented arguable claims that his trial counsel was ineffective for failing to investigate and call Willie Gulley as a witness at trial and for failing to challenge expert fingerprint testimony, and that appellate counsel was ineffective for not raising these issues on direct appeal. Defendant further argues that the exclusive-jurisdiction provision of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/5-120 (West 2006)) is unconstitutional. We affirm.

¶ 2                                   I. BACKGROUND

¶ 3    We previously summarized the evidence adduced at trial in our resolution of defendant's direct appeal (see *People v. Harmon*, 2011 IL App (2d) 091278-U), and we restate the pertinent facts here.

¶ 4    Witness testimony began on May 19, 2009. According to evidence presented by the State, then-16-year-old Michael Feehan left the Billiard Café in Rockford on June 2, 2006, at about 11:50 p.m. He got into his car, a 1992 maroon Buick, and put his wallet, cell phone, and pool cue on the passenger seat. Two black men, later identified as then-17-year-old defendant and Kenneth Chandler, approached; defendant went to the driver side window and Chandler went to the passenger-side window. Feehan had never seen the men before. Feehan rolled down his window, and defendant asked if he had a lighter. Feehan said that he did not smoke. Defendant then asked if he had any alcohol. Feehan said no, and he said that he would give them some money to buy a lighter at the gas station across the street. Feehan reached over to get his wallet, and when he turned to look back, defendant punched him in the left side of the face, knocking out some teeth.

¶ 5     The men dragged Feehan out of the car and hit and kicked him, telling him to get into the trunk. Feehan complied because they threatened to kill him otherwise. The men searched Feehan for his wallet, and after he told them that it was in the car, they closed the trunk. They drove off, with Feehan screaming from the trunk. Feehan heard them talking to people during some stops, and he also heard them talking to people using the speaker phone on his cell phone.

¶ 6     After several hours, the men popped the trunk and put Feehan's pool cue "over the bed of the trunk" so that he could not sit up or move. They told him that if he did not stop making noise they would kill him, but if he stopped, he would make it through. Feehan saw that defendant had duct tape with blood seeping through it on his left hand; defendant did not have that on his hand before he punched defendant. The men closed the trunk again. For the majority of the time that Feehan was in the trunk, the car was moving and Feehan was awake, though he fell asleep at some point.

¶ 7     The next morning, Feehan asked for food and water, and the men stopped and gave him food and water from McDonald's while he was still in the trunk. Later, he heard them driving on a gravel road that he felt they had already been on, but this time they stopped and popped the trunk and started tying him up with duct tape. They were near an abandoned house in a forested area. The men threw Feehan into an outhouse on the property and used branches to secure the door. They told Feehan that they were going to come back, and if he tried to escape and they found him, they would kill him.

¶ 8     After the men drove off, Feehan freed himself from the duct tape and got the door open. He ran to a house and found some people outside. They helped him call the police and his family. Feehan's father drove him to the hospital, where he was diagnosed with having multiple blunt contusions to his chest and face, a large abrasion on his upper lip, and a fractured front incisor. Feehan identified defendant in a photo lineup and in court.

¶ 9     On June 4, 2006, the police located Feehan's Buick in a wooded area near an intersection. There were two sets of tire marks in a grassy area, showing that two vehicles had been there. The Buick's interior had smoke and heat damage, and a small area in the backseat was burned. A gas can was in the front seat, with a pair of gloves under it. A partially burnt piece of paper, Feehan's class schedule, was outside on the ground next to the passenger side of the car. An arson investigator testified that the fire originated in the backseat and was intentionally set. He opined that the fire died out from a lack of oxygen because all of the car's windows and doors were closed. Inside the trunk, the police located a half-eaten burger and a cup from McDonald's, as well as a bag from McDonald's containing a receipt. Pictures from McDonald's security video cameras from a time corresponding to that indicated on the receipt showed a man, identified as defendant, purchasing food. The pictures also showed gauze or duct tape on his left hand.

¶ 10    We summarize the testimony of Detective Brian Shimaitis in more detail, as it is relevant to an issue defendant raises on appeal. Shimaitis was accepted as an expert in fingerprint analysis and comparison. He testified that he could not obtain fingerprints from the Buick's interior due to the soot that was coating everything. He recovered one latent fingerprint from the outside of the driver's-side window, which he matched to Chandler, and one latent print from the back of the school schedule, which he matched to defendant's left thumb.

¶ 11    Shimaitis explained that a latent fingerprint is compared to a known fingerprint with three levels of analysis. The first level is the pattern type, which can be loops, whorls, and arches.

- 3 -

The first level cannot be used to match a print, but it can be used to eliminate a print. If the pattern type in both prints is the same, the examiner looks at the flow of the ridge lines, checking how far apart they are spaced. Some prints have very thin, small ridge lines that are close together, while other prints have very wide ones that are far apart. If those are the same, the examiner looks at the "minutia" or details. Minutia include an ending ridge line, which comes to a stop; a bifurcation, where a line splits into two or more lines and continues; and a "dot" or "island," which is "a small section of friction ridge skin which looks like a dot or island with [*sic*] a couple cells long." The spatial relationship of the minutia is also examined. If minutia are on one print but not the other, the prints did not come from the same person. Finally, the prints would be shown to a second fingerprint examiner, and if either examiner felt that there was an unexplainable difference between the two prints, it would not be considered a match. Shimaitis used this methodology in determining that the print from Feehan's class schedule matched defendant's print. Fingerprints are unique and permanent, and no two fingerprints from different people have ever been found to be the same.

¶ 12    Shimaitis identified an enlargement of the latent fingerprint from the schedule, which was admitted into evidence. In examining the prints, he used two loupes, which magnified the prints four times, and pointed metal probes to check the spatial relationships between points. He did not document the points of comparison. There must be at least 4 matching minutia points for an identification, and in this case he found over 12. Shimaitis agreed that fingerprint identification was not an infallible science.

¶ 13    Defendant provided the following testimony. He was helping his aunt move on "Thursday" and "Friday" (June 2 and 3, 2006), and he cut his hand on Friday while helping move a couch. Therefore, his hand was wrapped in gauze and tape. Also on Friday, Chandler, a friend of defendant's, called and told him that he had just come back from Texas. The following day, Chandler picked him up in a maroon Buick, and defendant was with him for about 1½ hours. During that time, they drove to Chandler's friend's house and later picked up a few friends they saw outside. They next drove to the house of a person named Savante Brown. Defendant left Brown's house with Chandler, and Chandler asked defendant to buy some food for him at McDonald's because he was feeling lazy. Defendant admitted being in the video from McDonald's. Defendant gave Chandler the food and asked to be dropped off at his aunt's house so he could keep helping her move. He got there at about 1:30 or 2 p.m. That night, defendant "rapped" with some friends and then went home.

¶ 14    Defendant testified that he was in the front passenger's seat of the Buick when he was with Chandler. He did not remember touching any papers in the car but might have. Defendant denied striking Feehan and throwing him in the trunk.

¶ 15    On cross-examination, defendant admitted that he was left-handed. He did not recall telling police officers on July 4, 2006, that he was homeless. Defendant believed that he told the officers that he knew about a warrant for his arrest and was planning on turning himself in. Defendant did not know if he told the officers that he had not been riding in a maroon Buick on June 2, 3, or 4. Defendant agreed that he did not tell the officers that he had hurt his hand while moving furniture.

¶ 16    In rebuttal, an officer testified that on November 6, 2003, defendant had received juvenile adjudications for attempted residential burglary and residential burglary. Another officer testified that on July 4, 2006, defendant told the police that he was homeless. Defendant denied knowing Chandler and Brown and said that he had not been in a red Buick on June 2

or 3. The officer asked if defendant got the cut on his left hand from striking Feehan, and defendant said that he did not know what the officer was talking about. Defendant also said that he did not know what the officer was talking about when asked about being seen on the McDonald's video.

¶ 17 Defendant was found guilty of six counts of aggravated kidnaping (720 ILCS 5/10-2(a) (West 2006)), one count of robbery (720 ILCS 5/18-1(a) (West 2006)), one count of vehicular hijacking (720 ILCS 5/18-3(a) (West 2006)), and one count of arson (720 ILCS 5/20-1(a) (West 2006)). Convictions were entered on three of the aggravated kidnaping counts and the arson count. Defendant was sentenced to concurrent terms of 20 years' imprisonment for the aggravated kidnaping convictions and a consecutive 5-year term for the arson conviction.

¶ 18 On appeal, defendant argued that there was insufficient evidence to prove him guilty beyond a reasonable doubt of arson and that he was denied a fair trial when he was improperly impeached with juvenile adjudications. This court affirmed defendant's convictions. *Harmon*, 2011 IL App (2d) 091278-U.

¶ 19 Defendant filed a *pro se* postconviction petition on January 9, 2012, raising 11 claims. As pertinent here, defendant argued that trial counsel was ineffective for failing to: (1) investigate Gulley and call him as a witness and (2) challenge the admissibility of Shimaitis's testimony that defendant's thumbprint matched the print on Feehan's schedule. Defendant also argued that appellate counsel was ineffective for failing to raise these issues on direct appeal.

¶ 20 The trial court summarily dismissed the petition on March 20, 2012. It found that defendant's claim regarding Gulley was frivolous and patently without merit because Gulley's alleged testimony that defendant hurt his hand while helping a relative move would have been cumulative of defendant's testimony to this effect, and such testimony did not create an alibi. Therefore, reasoned the trial court, trial counsel's decision not to call Gulley was a matter of trial strategy. Regarding the fingerprint evidence, the trial court found that it was the trier of fact's role to consider the testimony and the weight to be given to that testimony. Defendant timely appealed.

¶ 21 II. ANALYSIS

¶ 22 The Act creates a three-stage process for the adjudication of postconviction petitions in noncapital cases. *People v. Harris*, 224 Ill. 2d 115, 125-26 (2007). At the first stage, the trial court independently determines, without input from the State, whether the petition is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2010); see *People v. Boclair*, 202 Ill. 2d 89, 99 (2002). A petition is frivolous or patently without merit only if it has no arguable basis in law or fact. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). This is true if the petition is based on an indisputably meritless legal theory, such as one that is completely contradicted by the record, or a fanciful factual allegation. *Id.* at 16-17. At the first stage, the petition's allegations, liberally construed and taken as true, need to present only "the gist of a constitutional claim." *People v. Brown*, 236 Ill. 2d 175, 184 (2010). The petition needs to set forth just a limited amount of detail and does not need to set forth the claim in its entirety. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). The trial court is not allowed to engage in any fact finding or credibility determinations at this stage, and all well-pleaded facts not positively rebutted by the record are taken as true. *People v. Scott*, 2011 IL App (1st) 100122,

¶ 23. If the petition is frivolous or patently without merit, the trial court must dismiss it. 725 ILCS 5/122-2.1(a)(2) (West 2010). Otherwise, the proceedings move on to the second stage. *Harris*, 224 Ill. 2d 115. We review *de novo* a trial court's first-stage dismissal of a postconviction petition. *People v. Shaw*, 386 Ill. App. 3d 704, 708 (2008).

¶ 23                    A. Ineffective Assistance of Counsel

¶ 24    On appeal, defendant argues that the trial court erred in summarily dismissing his postconviction petition, because it stated arguably meritorious claims of ineffective assistance of trial and appellate counsel. For a claim of ineffective assistance of counsel, a defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Hodges*, 234 Ill. 2d at 17. As to trial counsel, the defendant must first establish that, despite the strong presumption that counsel acted competently and that the challenged action was the product of sound trial strategy, counsel's representation fell below an objective standard of reasonableness under prevailing professional norms such that he or she was not functioning as the counsel guaranteed by the sixth amendment. *People v. Manning*, 227 Ill. 2d 403, 416 (2008). Second, the defendant must establish prejudice by showing a reasonable probability that the proceeding would have resulted differently had counsel's representation not been deficient. *People v. Houston*, 229 Ill. 2d 1, 11 (2008). The *Strickland* test also applies to claims of ineffective assistance of appellate counsel. *People v. Enis*, 194 Ill. 2d 361, 377 (2000). Thus, the defendant must show both that appellate counsel's performance was deficient and that the error was prejudicial. *People v. Robinson*, 217 Ill. 2d 43, 61 (2005). Unless an underlying issue has merit, there can be no prejudice from appellate counsel's failure to raise it on appeal. *People v. Stephens*, 2012 IL App (1st) 110296, ¶ 109. At the first stage of postconviction proceedings, a petition alleging ineffective assistance of counsel may not be summarily dismissed if it is arguable that counsel's performance fell below an objective standard of reasonableness and it is arguable that the defendant was prejudiced. *People v. Wright*, 2013 IL App (4th) 110822, ¶ 22.

¶ 25                    1. Failure to Call Gulley as a Witness

¶ 26    The decision of which witnesses to call at trial is a matter of trial strategy within trial counsel's discretion. *Enis*, 194 Ill. 2d at 378. Such a decision comes with the strong presumption that it is a product of sound trial strategy, and it is generally immune from claims of ineffective assistance of counsel. *Id.* Still, an attorney may be deemed ineffective for failing to present exculpatory evidence, such as failing to call witnesses to support an otherwise uncorroborated defense theory. *People v. Redmond*, 341 Ill. App. 3d 498, 516 (2003). Further, counsel has a duty to conduct both factual and legal investigations in the case. *People v. Montgomery*, 327 Ill. App. 3d 180, 185 (2001). Whether the failure to investigate constitutes ineffective assistance of counsel is determined by the value of the evidence not presented at trial and the closeness of the evidence that was presented at trial. *Id.*

¶ 27    Defendant argues as follows. The record shows that, although defendant told trial counsel about Gulley more than 2½ years before trial, counsel did not try to contact Gulley until a few days before trial. Counsel and the State finally spoke to Gulley on the first day of witness testimony, and they learned that Gulley would testify that defendant cut his hand while they were helping an aunt move. Gulley was not precisely sure what date the move occurred but

believed that it was on Friday, which would have been before Feehan was kidnaped on the night of Friday, June 3, 2006. This testimony would have been consistent with defendant's testimony about when and how he cut his hand, which would have helped the defense counter the State's argument that defendant cut his hand during the alleged crimes. However, counsel failed to promptly investigate Gulley, and he compounded his error by failing to subpoena him once he learned of how he would testify.

¶ 28    Defendant further argues that his petition presented an arguable claim that he was prejudiced by counsel's deficient performance. Defendant maintains that the State's case depended primarily on Feehan's identification of him as one of the assailants but his identification suffered from the following weaknesses: (1) Feehan briefly saw his assailants, at night; (2) Feehan initially described the man who punched him as 6 feet 1 inch tall and weighing 180 pounds, but a few days later described him as 5 feet 10 inches tall and 170 pounds; (3) Feehan initially described the second assailant as 6 feet 1 inch but later said that he was taller; and (4) Feehan testified at trial that he was punched only once but told the police a few days after the offense that he was punched twice. Defendant argues that the only physical evidence to corroborate Feehan's questionable identification was a thumbprint that was matched based on weak fingerprint analysis. Defendant contends that he also offered a credible explanation for why his thumbprint was found on the schedule, as he testified that he was in a maroon Buick with Chandler on the day of the incident and could have touched the paper then. Defendant argues that his testimony also undermined the State's argument that his buying food at McDonald's showed involvement in the kidnaping, as defendant testified that he did so at Chandler's request, without any knowledge of the kidnaping. Finally, defendant argues that, because the record shows that counsel was ineffective for failing to investigate and present testimony from Gulley, defendant raised an arguable claim that appellate counsel was ineffective for not raising this issue on direct appeal.

¶ 29    The State argues that the trial court properly dismissed the petition, because defendant failed to provide an affidavit from Gulley about his testimony or give a reasonable explanation as to why an affidavit was not attached. See 725 ILCS 5/122-2 (West 2010) (a postconviction petition must include attachments in the form of "affidavits, records, or other evidence" supporting the defendant's allegations, or an explanation of why such documents are lacking).

¶ 30    A defendant who claims that trial counsel was ineffective for failing to investigate and call a witness must support his allegation with an affidavit from the proposed witness. *Enis*, 194 Ill. 2d at 380. Otherwise, "a reviewing court cannot determine whether the proposed witness could have provided testimony or information favorable to the defendant, and further review of the claim is unnecessary." *Id.*; see also *People v. De Avila*, 333 Ill. App. 3d 321, 327 (2002) (rationale for affidavit requirement is the increased reliability and trustworthiness of a sworn statement). Still, a petition can survive without such attachments if the defendant's allegation is uncontradicted and supported by the record. *People v. Johnson*, 183 Ill. 2d 176, 191 (1998). Thus, in this case, since defendant's claims regarding Gulley and his testimony are based on evidence in the record, defendant was not required to obtain an affidavit from Gulley. See *People v. Johnson*, 377 Ill. App. 3d 854, 859 (2007) (the defendant was not required to attach affidavits to his postconviction petition because his claims, including his ineffective assistance claim, could be determined based on the record).

¶ 31    The State further argues that, although defendant gave Gulley's name to trial counsel 2½ years before trial, the record is clear that defendant did not alert counsel as to Gulley's potential testimony until a few days before trial. The State also maintains that Gulley's testimony would have been uncertain, bordering on irrelevant. Accordingly, argues the State, counsel's choice not to investigate Gulley or request a subpoena for him to testify did not fall below an objective standard of reasonableness. The State additionally argues that defendant failed to show arguable prejudice, because the evidence at trial provided overwhelming proof of defendant's guilt.

¶ 32    We agree with the State that defendant's claim, that trial counsel was ineffective for failing to investigate and call Gulley as a witness is frivolous and patently without merit. Defendant alleged that Gulley would have testified that defendant injured his hand on Friday, June 3, 2006. However, after speaking with Gulley, the assistant State's Attorney told the trial court:

> "[H]e doesn't have a clear recollection of the date or even times that he encountered the Defendant. He thinks it might have been the first weekend in June. He thinks it might have been specific times. He's very uncertain. ***
>
> ***
>
> *** He was confused when we talked to him. It might have been Friday, it might have been Saturday. He thought it was one hand, he wasn't sure where on the hand. He thought it might have been in a particular place. He has, at best, and [*sic*] indistinct recollection."

Trial counsel told the trial court that Gulley stated that he "believe[d]": that the injury occurred "three years ago around June, beginning of June, because a person was moving from one residence to another"; that the move took place on a Thursday and Friday, with defendant's injury occurring on a Friday; and that defendant injured his left hand.

¶ 33    A postconviction petition must present the gist of a claim for relief that is meritorious when considered in light of the record of the trial court proceedings. *People v. Deloney*, 341 Ill. App. 3d 621, 627 (2003); see also *People v. Coleman*, 183 Ill. 2d 366, 381-82 (1998) (reviewing court will uphold the dismissal of a postconviction petition where the allegations are contradicted by the record of the trial proceedings). Here, Gulley was not even certain when defendant's injury occurred, so it was not arguably unreasonable for trial counsel not to call him as a witness. Further, Gulley's testimony would have been cumulative of defendant's testimony on this subject (see *People v. Jarnagan*, 154 Ill. App. 3d 187, 194 (1987) ("Failure to call or investigate a witness whose testimony is cumulative does not demonstrate ineffective assistance of counsel.")), and it would not have provided defendant with an alibi for the crimes themselves.

¶ 34    Even otherwise, defendant was not arguably prejudiced by trial counsel's failure to have Gulley testify at trial, as there is not arguably a reasonable probability that the proceeding would have resulted differently had Gulley testified. Feehan identified defendant as one of the assailants in a photo lineup and at trial. Feehan had four distinct opportunities to view and hear the men: when they first approached the car; when they opened the trunk and told him to stop making noise; when they gave him food; and when they put him in the outhouse. Although defendant takes issue with Feehan's descriptions of the perpetrators to the police, the difference amounts to a few inches and 10 pounds.

¶ 35    Moreover, even if Gulley corroborated defendant's testimony that defendant hurt his hand helping someone move, it would not change the fact that defendant admitted at trial to riding around with Chandler in a maroon Buick while, according to Feehan's testimony, he was locked in the trunk of the car. Defendant also admittedly bought food from McDonald's, which is consistent with Feehan's testimony that defendant and Chandler gave him food while he was in the trunk. Correspondingly, video footage showed defendant in McDonald's, and the police found a McDonald's bag and receipt in the trunk. Defendant's admissions at trial contradict his initial statements to police, in which he denied being in the Buick or going to McDonald's, thus decreasing defendant's credibility. Given that Feehan identified defendant, whom he had never met before, as one of the assailants in an incident that took place during a time when defendant admittedly was present, defendant was not arguably prejudiced by counsel's failure to have Gulley testify that defendant hurt his hand during a move.

¶ 36                                    2. Fingerprint Evidence

¶ 37    Defendant next argues that his postconviction petition stated nonfrivolous claims that trial counsel was ineffective for failing to challenge the admissibility of testimony that defendant's thumbprint matched the print found on Feehan's class schedule, and that appellate counsel was ineffective for failing to raise this issue on direct appeal. Defendant argues that Shimaitis's testimony about the matching prints was the only physical evidence connecting defendant to Feehan's kidnaping. Defendant argues that the State failed to lay an adequate foundation for the testimony, because Shimaitis did not document or testify about the specific points of comparison he relied on to match the prints. Defendant argues that, instead, Shimaitis simply testified about the three-step process he generally follows when comparing fingerprints and that he examined the thumbprints under a magnifier and determined that they matched.

¶ 38    For expert testimony to be admissible, there must be an adequate foundation establishing that the information upon which the expert based his or her opinion is reliable. *People v. Negron*, 2012 IL App (1st) 101194, ¶ 34. Therefore, a fingerprint expert must lay an adequate foundation explaining how the expert reached his or her conclusion. *Id.* We review *de novo* whether foundational requirements have been met. *Id.*

¶ 39    Defendant analogizes this case to *People v. Safford*, 392 Ill. App. 3d 212 (2009). There, the fingerprint expert testified about the general process he used in fingerprint identification. He described the three levels of analysis and what characteristics he looked for at each level. *Id.* at 220. He did not explain how he arrived at his conclusion that a latent print matched the defendant's fingerprint, and on cross-examination, the expert testified that he took no notes as to the number of points of comparison between the prints. *Id.* at 221. The appellate court held that there was no legal foundation explaining how the expert reached his ultimate opinion, so the trial court erred in allowing his opinion into evidence. *Id.* at 228. The appellate court stated that the expert's testimony "amounted to no more than 'take my word for it,' where no opportunity to challenge that testimony [was] provided." *Id.* at 224. The court further stated that, while the lack of evidence of points of similarity between prints might go to the weight rather than the admissibility of the expert testimony, "as the paucity approaches zero, our concern is no longer with weight but with admissibility," and "[t]o

allow scientific testimony to be admitted without revealing its underlying scientific basis is to risk admitting such evidence without any scientific standards." *Id.* at 225.

¶ 40    Defendant argues that, like the expert in *Safford*, Shimaitis testified about the general, three-step process that he follows when analyzing fingerprints, but he did not document or identify any specific points of comparison. Defendant maintains that Shimaitis's testimony was essentially that he compared the two thumbprints with a magnifying tool and determined, based on his training and expertise, that they matched. Defendant claims that under *Safford*, Shimaitis's conclusion did not have a proper foundation and trial counsel ineffectively failed to object to the testimony on this ground. Defendant argues that the lack of objection could not have been based on any trial strategy, as the thumbprint was the only physical evidence that implicated defendant, and there was nothing to be gained by letting Shimaitis testify about the match.

¶ 41    Relevant to our analysis are two cases distinguishing *Safford*; *People v. Mitchell*, 2011 IL App (1st) 083143, and *Negron*, 2012 IL App (1st) 101194. In *Mitchell*, the fingerprint expert testified about the procedure she followed to compare latent prints and the defendant's known prints. *Mitchell*, 2011 IL App (1st) 083143, ¶ 26. She testified that she found 13 points of comparison and demonstrated 5 specific points to the jury. *Id.* The court stated that the "points of comparison, which examiner Siemer identified, provided ample grounds to challenge her opinion that the recovered prints matched the known prints of the defendant had the defendant elected to so do." *Id.* ¶ 27. In *Negron*, the court distinguished *Safford* by stating that the fingerprint expert in its case not only generally explained the process of fingerprint comparison but also went into detail about how he compared the prints in the case, including the type of minutia he looked for. *Negron*, 2012 IL App (1st) 101194, ¶¶ 37-38. The expert did not detail how many points of comparison he found, but the court stated that this went to the weight of his testimony, rather than its admissibility. *Id.* ¶ 40.

¶ 42    We conclude that this case is similar to *Mitchell* and *Negron* and is likewise distinguishable from *Safford*. In addition to testifying in detail about the general manner in which he compared fingerprints, Shimaitis testified that he applied such a procedure in comparing defendant's fingerprint card to the latent print lifted from Feehan's class schedule. While Shimaitis did not demonstrate any points of comparison to the jury, as the expert did in *Mitchell*, Shimaitis went further than the expert in *Negron* in that he testified that he found more than 12 specific points of comparison. Shimaitis's testimony offered a sufficient scientific basis for trial counsel to engage in a meaningful cross-examination. Therefore, it was not arguably unreasonable for defense counsel not to object to the foundation for Shimaitis's conclusion that the prints matched.

¶ 43    Even if, *arguendo*, counsel should have objected, defendant was not arguably prejudiced. Shimaitis testified that there were more than 12 points of comparison between the prints, and if counsel had objected to a lack of foundation, the State could have simply had Shimaitis demonstrate some of the points of comparison on the exhibits. Even if the fingerprint evidence had been entirely excluded based on an objection, there is not arguably a reasonable probability that the trial would have had a different outcome. Defendant admittedly rode in the Buick while, Feehan testified, he was in the trunk, and defendant even admitted that he might have touched the class schedule, so the identification of the print was not crucial to the case. *Cf. People v. McNeal*, 405 Ill. App. 3d 647, 673 (2010) (any error in admitting fingerprint evidence was harmless because the defendant admitted to being inside the

apartment). Also, Feehan's version of events was corroborated by defendant's admitted presence in the car and at McDonald's, the video from McDonald's, and the cut on defendant's hand. Further, Feehan identified defendant in a photo lineup and in court, and the differences in defendant's story to the police and his trial testimony decreased his credibility. Therefore, the trial court did not err in finding defendant's claims frivolous and patently without merit.

¶ 44                                B. Exclusive-Jurisdiction Statute

¶ 45     Last, defendant argues that the Juvenile Court Act's exclusive-jurisdiction provision (705 ILCS 405/5-120 (West 2006)) violates juveniles' constitutional rights because it automatically treats all 17-year-olds charged with felonies as adults during prosecution and sentencing, without any consideration of their youthfulness and its attendant circumstances. Defendant did not raise this issue in his postconviction petition, but a defendant may challenge the constitutionality of a statute at any time. *In re M.I.*, 2013 IL 113776, ¶ 39.

¶ 46     We presume that all statutes are constitutional, and the party challenging a statute's validity has the burden of demonstrating a constitutional violation. *People v. Vasquez*, 2012 IL App (2d) 101132, ¶ 53. Where reasonably possible, we must construe a statute so as to affirm its validity and constitutionality. *Id.* "Whether a statute is constitutional is a question of law, which we review *de novo*." *People v. McCarty*, 223 Ill. 2d 109, 135 (2006).

¶ 47     Defendant argues that, although he was not yet 18 years old, Illinois law required that he automatically be excluded from the juvenile court system and be tried and sentenced as an adult. Defendant maintains that the recent Supreme Court decisions in *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010), *J.D.B. v. North Carolina*, 564 U.S. ___, 131 S. Ct. 2394 (2011), and *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012), hold that fundamental differences between juvenile and adult minds make children under 18 less culpable than adults for the same offenses, and thus require additional constitutional protections for juvenile offenders.

¶ 48     In *Roper*, the Supreme Court held that the eighth amendment prohibits the death penalty for juvenile offenders. *Roper*, 543 U.S. at 568. The Court reasoned that the "death penalty is reserved for a narrow category of crimes and offenders," and that "juvenile offenders cannot with reliability be classified among the worst offenders." *Id.* at 569. In *Graham*, the Supreme Court held that the eighth amendment forbids a sentence of life without the possibility of parole for juveniles who did not commit homicide. *Graham*, 560 U.S. at 74, 130 S. Ct. at 2030. The Court said that, although the state is not required to release a juvenile during his natural life, the state is forbidden "from making the judgment at the outset that those offenders never will be fit to reenter society." *Id.* at 75, 130 S. Ct. at 2030. In *J.D.B.*, the Supreme Court held that a child's age, when known or objectively apparent to a reasonable police officer, is a relevant consideration in the *Miranda* custody analysis. *J.D.B.*, 564 U.S. at ___, 131 S. Ct. at 2406. In *Miller*, the Supreme Court held that the eighth amendment prohibits a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders, including those convicted of homicide. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. The Court stated that a judge must have the opportunity to look at all of the circumstances involved before determining that life without the possibility of parole is the appropriate penalty. See *id.* at ___, 132 S. Ct. at 2469.

¶ 49                                    1. Eighth Amendment

¶ 50     Defendant first argues that the exclusive-jurisdiction statute violates the eighth amendment, which prohibits "cruel and unusual" punishment. U.S. Const., amend. VIII. At the time of the offense, Illinois's juvenile court jurisdiction applied only to minors under 17 years old. See 705 ILCS 405/5-120 (West 2006).[1] Defendant argues as follows. Both *Roper* and *Graham* are grounded on the conclusion that juveniles are less deserving of the most severe punishments because they have less culpability than adults. See *Graham*, 560 U.S. at 68, 130 S. Ct. at 2026. In *Miller*, the Supreme Court again recognized that children: (1) have a lack of maturity and an underdeveloped sense of responsibility that leads to recklessness, impulsivity, and heedless risk-taking; (2) are more vulnerable to outside pressures and negative influences and do not have the ability to extricate themselves from horrific, crime-producing settings; and (3) have characters that are not as well-formed as adults, with traits less fixed and actions less likely to be evidence of irretrievable depravity. See *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464. If 17-year-olds are less culpable than adults, defendant continues, they should not automatically be subject to the same punishments as adults, without any prior finding that they should not be treated as juveniles. However, Illinois's exclusive-jurisdiction provision mandated adult prosecution and sentencing for all 17-year-olds, thereby violating the eighth amendment right to be free of cruel and unusual punishment.

¶ 51     The State argues that none of the cases cited by defendant stands for the sweeping proposition that 17-year-olds may not be subject to mandatory adult prosecution and adult sentences. The State maintains that: (1) *Roper*'s holding was limited to prohibiting the execution of juvenile offenders (*Roper*, 543 U.S. at 568-69); (2) *J.D.B.* restricted its holding to require officers to take into account a child's age in a custodial questioning situation (*J.D.B.*, 564 U.S. at ___, 131 S. Ct. at 2406); (3) *Graham*'s holding was limited to barring juvenile offenders from being sentenced to life in prison without parole for nonhomicide crimes (*Graham*, 560 U.S. at 52, 130 S. Ct. at 2017-18); and (4) *Miller* held only that the eighth amendment prohibits mandatory life without parole (*Miller*, 567 U.S. at ___, 132 S. Ct. at 2460). The State maintains that in stating that a sentencing judge must "consider[ ] an offender's youth and attendant characteristics *** before imposing a particular penalty" (*id.* at ___, 132 S. Ct. at 2471) the *Miller* Court was referring to the "particular penalty" of mandatory life without the possibility of parole. The State argues that, although *Miller* also states that mandatory penalties for juvenile offenders, such as life without parole, "preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it" (*id.* at ___, 132 S. Ct. at 2467), this reasoning does not encompass all adult sentencing, and the sentencing judge in an adult court still has the ability to apply individual sentencing considerations within the statutory sentencing ranges.

¶ 52     The State further notes that the *Miller* Court referenced mandatory transfer schemes and rebutted the respondents' suggestion that issues with harsh mandatory sentencing schemes for juveniles could be resolved by allowing the judge to have discretion in determining where to try a juvenile. The Court stated that, even when the judge has transfer-stage discretion, it

---

[1]The statute was amended, effective 2010, to also include in the juvenile court system minors under 18 who are not charged with a felony. See 705 ILCS 405/5-120 (West 2010). This change does not affect our analysis here.

has limited utility, in that (1) at this early stage the judge will typically have only partial information about the juvenile and the offense, and (2) a transfer decision often presents a choice between extreme punishments, and the judge might decide that a minor deserves a significantly harsher sentence than he or she would receive in juvenile court, even if the judge does not think that life without parole is appropriate. *Id.* at ___, 132 S. Ct. at 2474-75. The Court stated, "the discretion available to a judge at the transfer stage cannot substitute for discretion at post-trial sentencing in adult court–and so cannot satisfy the Eighth Amendment." *Id.* at ___, 132 S. Ct. at 2475.

¶ 53    Finally, the State quotes *Miller*'s statement that "*Graham*, *Roper*, and our individualized sentencing decisions make clear that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the *harshest possible penalty* for juveniles." (Emphasis added.) *Id.* at ___, 132 S. Ct. at 2475. The State argues that here defendant was not exposed to the harshest possible penalties envisioned by the recent Supreme Court cases, and the trial court considered defendant's juvenile status and its attendant circumstances before sentencing him.

¶ 54    We agree with the State's argument. As the State points out, *Graham*, *Roper*, and *Miller* stand for the proposition that a sentencing body must have the chance to take into account mitigating circumstances before sentencing a juvenile to the "harshest possible penalty." *Id.* The harshest possible penalties involved in those cases, *i.e.*, the death penalty and life imprisonment without the possibility of parole, are simply not at issue here. See *People v. Pacheco*, 2013 IL App (4th) 110409, ¶ 51 ("[T]he Supreme Court in *Roper*, *Graham*, and *Miller* was only concerned with the death penalty and life without the possibility of parole, which are the two most severe punishments allowed under the United States Constitution."). Further, the trial court was able to consider defendant's age, as well as other circumstances, in determining what sentence within the range to impose. Also, as the State notes, the *Miller* Court addressed the subject of automatic transfer statutes, which are similar to the exclusive-jurisdiction statute at issue here, and did not find them to be unconstitutional.

¶ 55    Moreover, appellate courts have previously considered and rejected the argument that defendant presents here, albeit in the context of the automatic transfer provision of the Juvenile Court Act (705 ILCS 405/5-130 (West 2006)). That statute provides exceptions to the juvenile jurisdiction otherwise provided in section 5-120, such as for minors who were at least 15 and are charged with certain violent offenses. See *People v. Toney*, 2011 IL App (1st) 090933, ¶ 37. In *People v. Salas*, 2011 IL App (1st) 091880, the defendant argued that the automatic transfer statute violated the eighth amendment because it required that all 15- and 16-year-olds charged with certain offenses be transferred to adult court without consideration of their youthfulness or culpability. *Id.* ¶ 65. The appellate court disagreed, reasoning that the eighth amendment prohibits cruel and unusual *punishments*, and the Supreme Court cases involved punishments subject to constitutional analysis under that amendment. *Id.* ¶ 66; see also *People v. Markley*, 2013 IL App (3d) 120201, ¶ 23 (*Graham* and *Roper* reviewed the constitutionality of sentencing statutes). The *Salas* court stated that, in contrast, the automatic transfer statute does not impose a punishment but rather specifies the forum in which the defendant's guilt may be adjudicated, so it is not subject to the eighth amendment. *Salas*, 2011 IL App (1st) 091880, ¶ 66; see also *Pacheco*, 2013 IL App (4th) 110409, ¶ 55 (agreeing with *Salas*). The same reasoning applies here.

- 13 -

¶ 56     Further, in *Pacheco*, the defendant argued that imposing an adult sentence on a juvenile under the automatic transfer statute violated the eighth amendment and the proportionate penalties clause. *Pacheco*, 2013 IL App (4th) 110409, ¶ 57. The appellate court stated that *Roper*, *Graham*, and *Miller* held not that the eighth amendment prohibits a juvenile from being subject to the same mandatory minimum sentence as an adult, but rather that the prohibition was limited to the mandatory minimum sentences of the death penalty or life without the possibility of parole. *Id.* ¶ 58. The court stated that the minimum 20-year sentence the defendant faced in that case did not compare to the sentences at issue in the Supreme Court cases. *Id.* Similarly, as stated, here defendant was not subject to the "harshest possible penalt[ies]" (*Miller*, 567 U.S. at ___, 132 S. Ct. at 2475) at issue in the Supreme Court cases. Accordingly, we find that the exclusive-jurisdiction statute does not violate the eighth amendment.

¶ 57                                   2. Due Process

¶ 58     Last, defendant argues that the exclusive-jurisdiction provision violates his right to both substantive and procedural due process under the federal and state constitutions. See U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. Defendant argues that the aforementioned Supreme Court cases suggest that juveniles have a fundamental liberty interest in not being automatically treated as adults, without any consideration of their youthfulness and its attendant circumstances. Defendant maintains that, even if juveniles do not have a fundamental liberty interest in not being automatically treated as adults for certain offenses, the statute still violates due process under the rational-basis test, because automatically treating all 17-year-olds as adults does not bear a rational relationship to the State's interest in protecting the public from the most dangerous juveniles.

¶ 59     Illinois precedent holds that the automatic transfer provision does not violate a juvenile's due process rights, and the same reasoning applies with equal force to the closely related exclusive-jurisdiction provision. In *People v. J.S.*, 103 Ill. 2d 395 (1984), our supreme court applied the rational-basis test to analyze the automatic transfer provision, and it stated that the statute was rationally based on the juvenile's age and the threat posed by the offenses because of the violence and frequency of their commission. *Id.* at 404; see also *People v. M.A.*, 124 Ill. 2d 135, 147 (1988) (holding that the automatic transfer provision does not violate due process). In *Salas*, the defendant argued that *J.S.* should be revisited in light of *Roper* and *Graham*. The appellate court disagreed, stating that *J.S.* remains good law because the Supreme Court cases related to eighth amendment challenges and did not address any due process arguments. *Salas*, 2011 IL App (1st) 091880, ¶¶ 76-77.

¶ 60     In *People v. Jackson*, 2012 IL App (1st) 100398, ¶ 16, the appellate court agreed with *Salas*, stating:

               "Both *Roper* and *Graham* decided constitutional challenges made to sentencing statutes: whether the death penalty and natural life in prison without parole for juveniles constituted cruel and unusual punishment under the eighth amendment. No due process arguments were raised or addressed in either *Roper* or *Graham*. In the instant case, we are concerned not only with a non-sentencing statute but a challenge made under the due process clause. Therefore, defendant's argument is without merit as *People v. J.S.* remains on solid footing with the Supreme Court's holdings in *Roper* and *Graham*. Defendant's substantive due process rights were not violated when he

was automatically transferred to adult court pursuant to the automatic transfer provision of the Illinois Juvenile Court Act of 1987 (705 ILCS 405/5-130 (West 2006)).”

The *Jackson* court further held that the automatic transfer provision does not violate procedural due process. *Id.* ¶ 17; see also *People v. Croom*, 2012 IL App (4th) 100932, ¶ 16 (relying on *Salas* and *Jackson* to conclude that the automatic transfer provision does not violate due process); *People v. Patterson*, 2012 IL App (1st) 101573, ¶ 27 (following *Croom*).

¶ 61   Defendant argues that the appellate court cases should not have relied on *J.S.*, because it was decided long before the Supreme Court cases he cites. Defendant maintains that *J.S.*'s holding rests on the propriety of discretionless transfers but that, after *Miller*, trial courts must exercise discretion and consider numerous factors before imposing severe adult penalties on juveniles. According to defendant, *Miller*'s reasoning necessarily eviscerates the foundation of *J.S.*'s procedural due process ruling. Defendant further argues that, although the appellate court cases distinguished the Supreme Court cases on the basis that the latter involved sentencing statutes, statutes that automatically designate a minor as an adult, such as the automatic transfer provision for first-degree murder and the exclusive-jurisdiction provision at issue here, do involve sentencing and invoke the protections of the eighth amendment.

¶ 62   We follow Illinois precedent and reject defendant's argument that the exclusive-jurisdiction statute violates his due process rights. Again, while the Illinois cases involve the automatic transfer provision, their reasoning applies equally here. Specifically, as those cases discuss, *Roper* and *Graham* addressed eighth amendment challenges, not alleged due process violations. *Roper* and *Graham* further involved sentencing statutes rather than forum statutes. *Miller*, which was not cited in the Illinois cases, does not compel a different conclusion, because it also involved an eighth amendment challenge to a sentencing statute. While defendant argues that the exclusive-jurisdiction statute directly relates to sentencing, he cannot escape the fact that the statute itself does not impose any penalties. Further, defendant's reliance on *Miller* is misplaced because, again, defendant views that case as extending to all adult penalties, whereas *Miller* was discussing the “harshest possible” penalties of capital punishment and mandatory life imprisonment without the possibility of parole. See *Miller*, 567 U.S. at ___, 132 S. Ct. at 2475. Defendant was not subject to such penalties, and the trial court here was able to consider his youth and its attendant circumstances when sentencing him. Accordingly, we conclude that the exclusive-jurisdiction provision does not violate defendant's right to due process.

¶ 63                                        III. CONCLUSION

¶ 64   For the reasons stated, we affirm the judgment of the Winnebago County circuit court.

¶ 65   Affirmed.