2023 IL App (1st) 210908-U
Order filed: June 22, 2023

FIRST DISTRICT
FOURTH DIVISION

No. 1-21-0908

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 04 CR 18171 |
| | ) | |
| SENECA SMITH , | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Justice Hoffman concurred in the judgment.
Justice Martin concurred in part and dissented in part.

**ORDER**

¶ 1    *Held*:    We affirmed the second-stage dismissal of defendant's postconviction claims of ineffective assistance of appellate counsel. We reversed the second-stage dismissal of defendant's postconviction claims of actual innocence, subornation of perjury, and ineffective assistance of trial counsel and remanded for a third-stage hearing thereon.

¶ 2    Defendant, Seneca Smith, appeals the second-stage dismissal of his postconviction petition. We affirm the dismissal of defendant's claims of ineffective assistance of appellate

counsel. We reverse the dismissal of defendant's claims of actual innocence, subornation of perjury, and ineffectiveness of trial counsel and remand for a third-stage evidentiary hearing.

¶ 3    The State charged defendant with the attempted first degree murder of Chicago police officers Calvin Chatman and Dwayne Collier, aggravated discharge of a firearm, aggravated unlawful use of a weapon, and unlawful use of a weapon by a felon, alleging that, on June 27, 2004, defendant shot at the officers with a handgun.

¶ 4    At the jury trial in October 2007, Officers Chatman and Collier testified that on June 27, 2004, they were assigned to the 5300 block of West Congress Parkway to conduct surveillance on a red Chevy Caprice, which was believed to contain drugs and guns that were associated with the shooting of Shawn Wooden that had occurred on that block earlier that day at about 7:30 p.m. They went to that location in a covert van. Chatman was in the driver's seat, and Collier was in the front passenger seat. They were in civilian dress and wore their police badges on chains around their necks. Chatman was armed with a Sig Sauer 9-millimeter semiautomatic handgun with Luger hollow-point ammunition. Collier was armed with a Smith and Wesson 9-millimeter semiautomatic weapon.

¶ 5    At about 10:30 p.m., the officers arrived on the block and parked their van facing westbound in front of 5310 West Congress Parkway, approximately five houses west of the intersection of Congress Parkway and Lockwood Avenue.

¶ 6    There was a group of 6 to 10 males on the north side of the street about seven or eight houses to the west of Chatman and Collier. One person broke away from that group and approached the officers' van. He stood parallel to the van's passenger-side door for about 10 to 20 seconds and then walked back to the group and started to talk demonstratively, wave his hands, and point directly at the van.

¶ 7     Within seconds, defendant came out of the group and walked toward the van. Defendant's right hand was underneath his jersey, so Chatman unholstered his gun and held it in his right hand. He warned Collier, who was talking on his cellphone. Chatman also pulled his badge out from beneath his jersey and draped it on his chest.

¶ 8     When defendant approached the passenger-side door, his hand was still underneath his jersey. Defendant cursed at the officers and asked what they were doing there. Chatman said, "Relax, we're the police." Defendant cursed again and raised a black handgun to Collier's face. Officer Chatman extended his right hand and fired his gun twice in defendant's direction.

¶ 9     Defendant went to the ground, and the officers exited the van. Defendant got up and ran westbound on the north side of the street. Collier yelled, "Police, stop," and chased him. Meanwhile, Chatman ran parallel to them in the middle of Congress Parkway. Collier continued to announce his office, and defendant ran in a southwesterly manner onto the street. Defendant turned and pointed his gun in the direction of the officers and fired. Collier testified that defendant fired once or twice, and Chatman testified that he heard two gunshots. Although defendant was facing south, his upper body was twisted so that his arm was facing east. Chatman and Collier veered back to the north side of the street but kept running westbound, and Collier fired two shots at defendant.

¶ 10     Defendant ran to a building at 5331 West Congress Parkway and tried to force the door open with his right shoulder. Collier took cover behind a large tree on the south side of the street at that address. Chatman also took cover behind a vehicle on the south side of the street. Then, defendant pointed the gun in the direction of Collier, who fired two more shots. At that time, the door opened and defendant fell or went inside the dark vestibule. The officers never saw defendant throw or drop the gun during the entire incident.

¶ 11 Collier approached the door with his gun drawn and went into the vestibule. He looked through an open doorway to a basement apartment and saw defendant lying at the bottom of the steps. At that point, Collier heard women in the basement screaming. He went back outside and ran eastbound down the block to get assistance, where he was met by Officer Robertson. They returned to 5331 West Congress Parkway and stood in the street as more police cars started to arrive at the scene. Meanwhile, Chatman returned to the van and drove around the corner to cover the back of 5331 West Congress Parkway to prevent anyone from leaving. Other officers, however, had arrived at the scene, so Chatman directed them down the alley and then returned to the front of the building. The officers later learned that a bystander in the building, Chantel Davidson, had been hit by a bullet during this incident. Davidson subsequently filed a civil lawsuit against the officers.

¶ 12 Jerry Blakes testified that he lived on the 5300 block of West Congress Parkway. Around 10:30 p.m. on June 27, 2004, he was cleaning glass out of his automobile, which had been damaged by the shooting earlier that evening. He heard some noise and saw a policeman walk past with a badge around his neck. A few seconds later, the officer hollered, "police, police." Blakes did not see anyone else running and did not hear any gunfire.

¶ 13 Chicago police officer Paul Presnell was a forensic investigator. He and his partner arrived at about 11:55 p.m. and processed the scene. They did not administer a gunshot residue test to defendant because he already had been taken to the hospital. At 5331 West Congress Parkway, there were two bullet holes in the glass of the front door. Blood and a metal fragment were on the vestibule floor, and blood was on the basement floor. Outside, they recovered four Speer 9-millimeter Luger cartridge cases, two CBC 9-millimeter Luger cartridge cases, and four R&P 45 auto cartridge cases. They also recovered two fired bullets and three metal fragments.

¶ 14    After the investigators left the scene, they were called back about 45 minutes later to recover a Ruger 9-millimeter semiautomatic pistol from under a bush in front of the residence at 5318 West Congress Parkway. The scene was no longer taped off or secured. The gun had one live round in the chamber and 11 live rounds in the magazine. They also recovered from 5316 West Congress Parkway a fired S&B 9-millimeter Luger cartridge case. At 5324 West Congress Parkway, they recovered a fired R&P auto cartridge case. At 5328 West Congress Parkway, they recovered a fired Speer 9-millimeter Luger cartridge case. From a van located at 620 South Lockwood Avenue, they recovered one fired cartridge case and broken glass.

¶ 15    Tonia Brubaker, of the Illinois State Police forensic science command, testified as a firearms expert. She concluded that two 9-millimeter Luger cartridge cases, a bullet jacket fragment, and two other fragments were fired from the Ruger firearm. Four Speer 9-millimeter Luger cartridge cases and one bullet fragment were fired from Collier's Smith and Wesson handgun. Two Speer 9-millimeter Luger cartridge cases were fired from Chatman's Sig Sauer firearm.

¶ 16    On cross-examination, Brubaker testified that she also received several cartridge cases recovered from the earlier, 7:30 p.m. shooting of Shawn Wooden which also matched the Ruger. Brubaker received other cartridge cases, bullets and fragments that did not match any of the three guns in this case.

¶ 17    Davere Jackson was formerly employed as a DNA analyst by the Illinois State Police Forensic Science Center and testified as a DNA analysis expert. Jackson generated a DNA profile from defendant's sealed buccal standard and compared it with two sets of swabs that were collected from the Ruger firearm. Concerning the first set of swabs, which were collected from the left-side handle, trigger guard, magazine release and hammer spur of the Ruger, Jackson identified a

mixture of human DNA profiles, which she interpreted as having been contributed by at least two people. Of the 14 potential loci that could present a full profile for purposes of DNA testing, the lab did not test four of the loci, and five additional loci could not be detected, leaving only five loci for a comparison to defendant. Of those five loci, only four matched defendant. Given the small number of loci tested, Jackson determined that no conclusion could be drawn as to whether or not defendant could have contributed to the mixed profile from the first set of swabs.

¶ 18    Concerning the second set of swabs, which were collected from the right-side handle, safety lever, trigger guard and butt of the Ruger, Jackson identified a partial DNA profile containing a mixture of human DNA, which she interpreted as having been contributed by two people. The lab again did not test four of the 14 potential loci, and four additional loci could not be detected, leaving only six loci to compare to defendant's sample. Jackson concluded that defendant could not be excluded from having contributed to this mixture of DNA profiles found on the weapon. However, Jackson could not say with a reasonable degree of scientific certainty that defendant handled the weapon on June 27, 2004, because approximately 9% of the Black population also could not be excluded from having contributed to the mixture of DNA profiles found on the weapon.

¶ 19    Assistant State's Attorney (ASA) Catherine Gregorovic testified that on the evening of June 28, 2004, Katrina Robinson agreed to give a handwritten statement. According to the statement, at about 3 p.m. on June 27, 2004, Robinson saw defendant speaking with her friend at Van Buren Street and Central Avenue. Defendant lifted up his shirt and showed Robinson's friend a gun. Later, during the shooting at issue, Robinson already was in the vestibule when defendant came into the hallway, and Robinson could not see what was happening because she was pushed against a wall.

¶ 20    ASA Karin Swanson testified that she presented Robinson to the grand jury on July 7, 2004, and Robinson's testimony was completely consistent with her handwritten statement.

¶ 21    Robinson testified at trial that she was 15 years old in 2004 and knew defendant from her neighborhood. She did not remember seeing defendant lift his shirt on June 27, 2004, to show a gun in his waistband. Initially, she said she did not remember speaking to an ASA on June 28, 2004, but later admitted that she read over her statement and signed it. She did not recall what she said in her statement but testified that she made the statement to get the ASA "out of [her] face." When she was asked whether she testified before the grand jury about seeing defendant lift his shirt and show a gun, she said, "I don't remember."

¶ 22    On cross-examination, Robinson testified, contrary to her written statement, that she did see what was happening in the hallway at 5331 West Congress Parkway and defendant did not have a gun when the police were shooting at him.

¶ 23    The parties stipulated that Chantel Davidson was treated at the hospital on June 27, 2004, for a gunshot wound, and a bullet was removed from her upper back. Defendant was treated for multiple gunshot wounds to his chest, as well as gunshot wounds to his back, arm, and leg.

¶ 24    For the defense, Shanice Wooden testified that her family lived at 5314 West Congress Parkway on June 27, 2004. At about 7 p.m., she was sitting with three people in an automobile across the street from her house. Shanice's brother Shawn was sitting on their grandmother's van. Shanice's sisters were on the porch, and her mother, Dora Wooden, was on the upstairs balcony. A man named Teddy and two other males came around the corner of Congress Parkway and Lockwood Avenue. One of the males called Shawn over to them, but Dora told him to run because Teddy had two guns and the two other men each had a gun. Shawn, who did not have a gun, ran, and the three males chased him and fired their weapons. Shawn was shot in the back by Teddy on

the north side of the street a few houses away from 5314 West Congress Parkway and fell onto the grass.

¶ 25    Teddy dropped one of his guns, and he and the other two men ran into a crowd of people. Shanice picked up Teddy's gun and chased after them. When she got to the end of the block, a police officer ordered her to stop. She dropped the gun, which the police recovered. She never fired the gun. Shanice was arrested but the police released her the next day. She did not see defendant on the street at the time Shawn was shot.

¶ 26    Dora testified consistently with Shanice about the shooting of Shawn. Around 10:30 p.m., Dora, her husband, and Shanice returned home from the hospital and police station. Defendant was standing near Dora's house with a green, plastic soda bottle in his hand. He did not have a gun. People were sitting in a van parked in front of Dora's house. A person in the van cursed,  pointed the gun out of the van, and fired. Defendant was shot in the chest, rolled over backwards and then ran west. The people exited the van and Dora noticed their police badges. She ran onto her porch and lost sight of defendant.

¶ 27    Carrie Warfield testified that she lived in the basement apartment at 5331 West Congress Parkway. At 10:30 p.m. on June 27, 2004, she was coming home from the store with Chantel Davidson, Katrina Robinson, and five other friends. Warfield saw defendant, who was across the street, and greeted him as he walked east on Congress Parkway with a soda bottle in his hand. When Warfield heard gunfire, she and her friends ran into the vestibule. Defendant ran up behind them and came in the door. He did not have a gun. Gunshots came through the glass of the door. Defendant was hit by bullets and fell to the floor. Warfield's friends ran down the basement steps. Defendant could not move, so Warfield put her hands under his arms and "flipped" him down the stairs. Defendant landed on his back, and Warfield saw that he had no gun.

¶ 28    During closing arguments, the State emphasized the importance of the Ruger to its case:

"[T]his gun that was recovered hours later, ladies and gentlemen, testing a month after it was recovered, again, how could anybody have known that gun would come back to the firearm evidence that is in the street where the officer tells you the route [that] the defendant went? It goes to support exactly what the officers told you happened. *** When you go back to deliberate, ladies and gentlemen, you will have the evidence back there with you. You will have among other things the gun, the same gun the defendant pointed at *** [t]he same gun that comes back to the firearm evidence that was recovered in this case that mirrors the route the defendant took. You will be able to see the gun that threatened to take both Officer Collier and Chatman's lives that night."

¶ 29    The State further noted that the DNA evidence indicated that defendant "could not be excluded as having touched that gun."

¶ 30    During the defense closing argument, defendant argued his innocence on the basis that the Ruger was not recovered from his person at the time of the shooting, but instead was recovered the next morning from underneath a bush down the street. There was no fingerprint evidence or gunshot residue tying him to the gun; further, the DNA evidence was so inconclusive that approximately 600 million other people could not be excluded as having handled the gun. The defense theorized that the Ruger recovered from underneath the bush had been involved in the earlier shooting of Shawn Wooden on the same street and had no connection to him.

¶ 31    During rebuttal, the State argued that defendant "is security for the block of 5300 West Congress" and he let "everybody know that he's got a gun and he is controlling the block." Defendant used that gun to shoot at the officers. The reason that the officers did not recover the Ruger from defendant's person is because defendant "is not going to get caught with that gun" and

some unidentified individual "got rid of it." The State emphasized that "[t]hey play a game on that block called hide the gun. *** Somebody got that gun out of there." The State discounted the defense argument that the Ruger was involved in the shooting of Shawn Wooden and had no connection to defendant, emphasizing that "[i]f this [Ruger] is a gun being used to shoot at Shawn Wooden, *** why is [defendant's] partial DNA on it?" The State mentioned two other times that defendant's partial DNA was found on the Ruger.

¶ 32    The jury convicted defendant of two counts of attempted first degree murder of a police officer and two counts of aggravated discharge of a firearm. The trial court merged the aggravated discharge of a firearm counts into the attempted murder counts, and sentenced defendant to 35 years for each count, to run concurrently. The trial court added 20 years for the discharge of a firearm for a total of 55 years in prison.

¶ 33    On direct appeal, we affirmed defendant's conviction and corrected the mittimus. *People v. Smith*, 2012 IL App (1st) 102354 (R. Gordon, J., dissenting).

¶ 34    On March 7, 2018, defendant filed a second amended postconviction petition asserting a claim of actual innocence. Defendant attached a report from Cellmark Laboratory, which had conducted additional DNA testing of the Ruger subsequent to trial, using recent advances in DNA technology to identify a more complete profile. Cellmark swabbed the Ruger's grip and magazine release, trigger and trigger guard, and slide area and then performed DNA testing on these swabs using a polymerase chain reaction (PCR) and AmpFISTR Identifiler Plus Kit. The Identifiler Kit amplifies 15 loci, including the 13 required loci for the Combined DNA Index System (CODIS), as well as two additional loci.

¶ 35    Cellmark obtained a partial DNA profile from the swabbings of the grip and magazine release that consisted of a mixture of at least two individuals. Cellmark detected reportable DNA

types at 14 of the 15 loci (as opposed to the State laboratory which at the time of trial had only been able to detect DNA types at six loci in one sample and five loci in another). After analyzing the DNA types at these 14 loci, Cellmark concluded that defendant was excluded as a possible contributor of DNA to this mixture.

¶ 36    Defendant also attached an affidavit from Ranald Stancle, who attested that on a weekend in June 2004, a man named Teddy told him that Shawn Wooden had previously shot up his automobile. In retaliation, Teddy, Stancle, and another man went to Wooden's house on the 5300 block of West Congress. Stancle was carrying a 9-millimeter Ruger loaded with 17 bullets. When they saw Wooden, Stancle fired four or five shots at him as he ran west on Congress. The other two men also fired shots at Wooden, one of which struck him in the back.

¶ 37    Following the shooting, Teddy told Stancle to go back to the 5300 block of West Congress early the next day to find and shoot any of Wooden's associates.  At six a.m. the next day, Stancle returned to the 5300 block of West Congress while carrying the same 9-millimeter Ruger. While walking past Wooden's house, Stancle noticed police tape and he also saw a police vehicle approaching. Stancle threw the Ruger under a bush on the north side of Congress just two or three houses west of Wooden's house and then left the block.

¶ 38     Defendant argued that the Cellmark report and Stancle's affidavit constituted new, material, non-cumulative evidence that likely would change the result on retrial and, thus, makes a substantial showing of actual innocence necessitating a third-stage hearing.

¶ 39    In addition to asserting a claim of actual innocence, defendant also argued that the State deprived him of due process by suborning Chatman and Collier's perjured testimony at trial. Defendant argued that contrary to the officers' testimony at  trial, he did not possess or use the Ruger during the incident. In support, defendant attached the affidavit of firearms expert John

-11-

Murdock. Murdock recounted the officers' testimony about the path defendant ran while fleeing from and shooting at them. Murdock also recounted Brubaker's testimony at trial identifying one bullet jacket and one bullet jacket fragment, as well as two cartridge cases, as having been fired from the Ruger. Murdock further recounted Presnell's testimony that the fired bullet jacket was found in the street at 5327 West Congress Parkway, the fired bullet jacket fragment was found on the sidewalk at 5335 West Congress Parkway, and the cartridge cases were found in the street in front of 5316 West Congress and in the grass by the curb in front of 5321 West Congress. Murdock concluded that Chatman and Collier's account of the shooting was false because:

"[I]t is unlikely that one of the bullet jackets would end up at 5327 West Congress, so close to where the officers testified that [defendant] was running, and west of both cartridge casings associated with the Ruger. And it is extremely unlikely that a bullet jacket fragment would have ended up at 5335 West Congress—further west than either cartridge casing and farther west than [defendant] ever ran."

¶ 40    Defendant also attached the affidavit of Robert T. Baikie, a former Chicago police officer who specializes in analyzing and diagramming crime scenes. Baikie attested:

"Based upon my analysis and review of the crime scene, the trial testimony of Officer Chatman cannot be reconciled with the physical layout of the 5300 block of West Congress Parkway. Chatman testified at trial that when [defendant] was running toward 5331 West Congress, Chatman ran and took cover behind a car on the south side of Congress, to the west of 5331 West Congress. Officer Chatman testified that from this vantage point, he saw [defendant] attempt to force his way into the front door of 5331 West Congress and then extend his right arm with a gun in his hand pointed toward Officer Collier, at which point Collier shot [defendant].

My evaluation of the scene reveals that Chatman could not have seen what he claimed to see in his sworn testimony. Any view of the front vestibule at 5331 West Congress from any point west of that address is blocked by the front section of 5331 West Congress, which extends north from the vestibule. This makes it impossible that Chatman saw, from his vantage point behind the car, [defendant] point a gun at Collier from the vestibule area."

¶ 41    Baikie noted that his analysis of the scene was consistent with an investigation conducted by the Chicago Tribune as set forth in a January 26, 2010, article that similarly concluded that from his supposed vantage point behind the vehicle, Chatman would not have been able to see defendant point a gun at Collier from the vestibule area. Baikie attached the Chicago Tribune article to his affidavit and the article is contained in the record on appeal.

¶ 42    Defendant further raised the claim that his trial counsel committed ineffective assistance by failing to investigate and present expert crime scene and firearms testimony that would have supported the defense theory that Officers Chatman and Cutler were not truthful in their testimony and that the recovered firearm evidence was from the earlier shooting. Defendant also claimed that his counsel on direct appeal was ineffective for failing to argue that the trial court abused its discretion by denying the defense motion to exclude Robinson's testimony; and for failing to argue that trial counsel was ineffective for failing to move to exclude the State's DNA evidence and the Ruger on relevancy grounds.

¶ 43    The postconviction court dismissed the petition at the second stage. Defendant appeals.

¶ 44    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a three-stage procedure for criminal defendants to raise constitutional issues about their trial or sentencing that could not have been raised on direct appeal. *People v. Morales*, 2019 IL App (1st)

160225, ¶ 17. At the first stage, the postconviction court evaluates the petition and determines whether it is frivolous or patently without merit. *Id.* If the court determines that the petition is not frivolous or patently without merit, it is docketed for second-stage proceedings, during which counsel can be retained or appointed, and defendant must show that his petition makes a substantial showing of a constitutional violation. *Id.* The State can participate for the first time at the second stage and either answer the petition or move to dismiss. *Id.* All well-pleaded facts in the petition and accompanying affidavits that are not positively rebutted by the original trial record are taken as true and the court does not engage in fact-finding or credibility determinations nor resolve any evidentiary questions. *People v. Velasco*, 2018 IL App (1st) 161683, ¶¶ 90, 117. Our review of a second-stage dismissal is *de novo*. *People v. Minniefield*, 2014 IL App (1st) 130535, ¶ 58.

¶ 45     If the petition makes a substantial showing of a constitutional violation, it advances to the third-stage evidentiary hearing where the postconviction court receives evidence and determines whether defendant is entitled to relief. 725 ILCS 5/122-6 (West 2020). At the third-stage hearing, the court acts as a fact-finder, making credibility findings, determining the admissibility of evidence, and weighing the evidence. *People v. Reed*, 2020 IL 124940, ¶51; *Velasco*, 2018 IL App (1st) 161683, ¶118.

¶ 46     First, defendant argues that the postconviction court erred by dismissing his claim of actual innocence based on Stancle's affidavit and the DNA evidence provided by Cellmark. To succeed on a claim of actual innocence, defendant must present newly discovered, material, noncumulative evidence that is so conclusive that it probably would change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47. Newly discovered evidence is evidence that was discovered after trial and that defendant could not have discovered earlier through the exercise of due diligence. *Id.* Evidence is material when it is relevant and probative of defendant's innocence. *Id.* Noncumulative

evidence adds to the information that the jury heard at trial. *Id.* Finally, the conclusive character element requires defendant to present evidence placing the trial evidence in a different light and undermining the court's confidence in the judgment of guilt. *Id.* ¶ 56. New evidence is conclusive when, after considering it along with the trial evidence, a different result probably would occur. *Id.* ¶ 47. "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.* ¶ 48.

¶ 47    Stancle's affidavit is newly discovered, as he did not come forward with his statement about his use of the Ruger and his discarding it under the bush until 2013, about six years after defendant's trial. In his own affidavit, defendant attested that he has never met Stancle and had not even heard of him until 2013. Thus, no amount of due diligence could have led to the discovery of this evidence any sooner. See *People v. Harper*, 2013 IL App (1st) 102181, ¶ 41 (evidence was considered newly discovered when the witness did not come forward with exculpatory testimony until several years after petitioner's trial).

¶ 48    The DNA evidence provided by Cellmark also was newly discovered. After filing his original petition for postconviction relief in 2013, defendant sought and was granted leave to conduct additional DNA testing on the Ruger by Cellmark. Cellmark submitted its report in November 2014, using recent advances in DNA technology to identify a more complete DNA profile of the swabbings recovered from the Ruger. Because Cellmark's report was the result of a type of DNA testing that was not available at the time of defendant's trial, the results constitute newly discovered evidence. See *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009).

¶ 49    Stancle's affidavit and the DNA evidence provided by Cellmark are also material and non-cumulative. The evidence that Stancle used and discarded the Ruger, and that new DNA testing can exclude defendant as a possible contributor of DNA to the mixture recovered from the grip

and magazine release, is relevant and probative of defendant's innocence and adds to the information heard by the jury at trial.

¶ 50 The State does not dispute that Stancle's affidavit and the DNA evidence provided by Cellmark are newly discovered, material, and non-cumulative, but it argues that such evidence is not conclusive. In determining the conclusive nature of the new evidence, we note our supreme court's holding that "the new evidence supporting an actual innocence claim need not be entirely dispositive to be likely to alter the result on retrial. [Citation.] Rather, the conclusive character element requires only that the petitioner present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 56.

¶ 51 The conclusive character element has been met here. The State's case hinged on its theory that notwithstanding the lack of any fingerprint evidence or gunshot residue tying defendant to the Ruger, the officers' testimony along with the shell casings and cartridge cases found at the scene and the DNA testing performed on the Ruger were sufficient to show that defendant fired the weapon at them. The State theorized that someone from the block subsequently hid the weapon, which was found about 45 minutes after the officers initially processed the crime scene.

¶ 52 The State's case, and specifically the officers' testimony, is undercut by Stancle's affidavit that he (not defendant) was in possession of the Ruger at the time that defendant allegedly shot at the officers. Stancle attested that he used the Ruger to shoot Shawn Wooden at the 5300 block of West Congress Parkway several hours prior to the shooting at issue here. Stancle's statement is corroborated by the fired cartridge cases matching the Ruger that were recovered as part of the investigation into the Wooden shooting. While two cartridge cases and some bullet fragments matching the Ruger also were recovered as part of the investigation into the instant case, Stancle's

affidavit indicates they could have been left over from the earlier shooting of Wooden on the same block. Stancle further attested that he retained possession of the Ruger in the immediate aftermath of the Wooden shooting until the next morning, when he returned to the 5300 block of West Congress Parkway and hid the weapon underneath a bush. Stancle's statement is corroborated by the officers' failure to discover the Ruger until they were called back to the crime scene about 45 minutes after processing it, when they found the Ruger under the bush where Stancle claimed he had hid the weapon.

¶ 53    The State's reliance on Jackson's testimony regarding the DNA results generated by the State crime lab also was undercut by Cellmark's report. Jackson testified that the results of the crime lab's testing were inconclusive about defendant's DNA match to the Ruger's left-side handle, trigger guard, magazine release and hammer spur. Jackson further testified that defendant could not be excluded as a match to the right-side handle, safety lever, trigger guard, and butt. However, contrary to the crime lab, which tested only four loci on the left-side handle, trigger guard, magazine release, and hammer spur, and tested only six loci from the right-side handle, safety lever, trigger guard, and butt, Cellmark used recent advances in DNA testing to test 14 loci, which excluded defendant as a possible contributor of DNA to the sample recovered from the grip and magazine release. The Cellmark result belies the State's argument during closing that the Ruger contained defendant's "partial DNA."

¶ 54    Taking Stancle's affidavit and Cellmark's laboratory result as true at the second stage of postconviction proceedings, as we must, defendant has made a substantial showing that this new evidence places the trial evidence in a different light so as to undermine the court's confidence in the judgment of guilt. Accordingly, we reverse the second-stage dismissal of defendant's postconviction claim of actual innocence and remand for a third-stage evidentiary hearing, during

which the postconviction court can determine witness credibility, decide the weight to be given the testimony and evidence, and resolve any evidentiary conflicts.

¶ 55    Next, defendant argues that the postconviction court erred by dismissing his subornation of perjury claim related to the allegedly false testimony given by Chatman and Collier identifying him as the shooter. The State's knowing use of false testimony to obtain a criminal conviction constitutes a violation of due process of law. *People v. Olinger*, 176 Ill. 2d 326, 345 (1997). " 'In order to establish a violation of due process, the prosecutor actually trying the case need not have known that the testimony was false; rather, knowledge on the part of any representative or agent of the prosecution is enough.'" *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 66 (quoting *Ollinger*, 176 Ill. 2d at 347); *People v. Smith*, 352 Ill. App. 3d 1095, 1101(2004) (same). The prosecution is charged with knowledge of its agents, which includes the police. *Id.* Thus, "an officer's perjury is imputed to the State, regardless of whether the prosecutor trying the case knew that the testimony was false." *People v. Moore*, 2022 IL App (1st) 192290, ¶ 37. Defendant's conviction must be set aside if there is a reasonable likelihood that the perjured testimony affected the jury's verdict. *Olinger*, 176 Ill. 2d at 345. This standard is equivalent to the harmless error standard. *People v. Lucas*, 203 Ill. 2d 410, 422 (2002).

¶ 56    At trial, Chatman and Collier testified that after defendant aimed the gun at Collier while they were seated in the van, Chatman fired at defendant. Defendant ran away in a southwesterly direction, turning his body to the south and extending his arm to the east, twisting his upper body as he fired the gun. Also at trial, Chatman testified that he took cover behind an automobile west of 5331 West Congress, where he saw defendant lower his right shoulder in an attempt to gain access to the doorway of the building there. Chatman then saw defendant point the gun in the direction of Collier, who fired two shots at defendant.

¶ 57    In his amended postconviction petition, defendant attached affidavits from firearms expert Murdock and crime scenes specialist Baikie, who each attested to the falsity of the officers' testimony. Specifically, Murdock attested that the officers' account of defendant's flight from them in a southwesterly direction toward 5331 West Congress, during which he fired shots in their direction while twisting his body to the east, was irreconcilable with the recovery of a bullet jacket at 5327 West Congress and with the recovery of a bullet jacket fragment at 5335 West Congress.

¶ 58    Baikie attested to the falsity of Chatman's account that while taking cover behind an automobile west of 5331 West Congress, he viewed the front vestibule of the building located there and saw defendant attempt to gain access to that building while pointing his weapon at Collier. Baikie stated that Chatman "could not have seen what he claimed to see in his sworn testimony" because his view of the front vestibule of 5331 West Congress would have been blocked. Therefore it was impossible for Chatman, from his vantage point behind the automobile, to see defendant point his weapon at Collier.

¶ 59    Taking Murdock's and Baikie's affidavits as true, as we must at the second stage of postconviction proceedings, defendant has made a substantial showing that the State committed a due process violation by suborning Chatman and Collier's perjured testimony regarding their account of the shooting.

¶ 60    We cannot say at these second-stage proceedings that the use of the officers' allegedly perjurious testimony was harmless, as their testimony identifying defendant as the shooter was critical to the State's case. No weapon was recovered from defendant's person, and the weapon that was later recovered from underneath a bush was not linked to defendant through fingerprint evidence or a gunshot residue test. The DNA recovered from the Ruger was inconclusive. Several eyewitnesses contradicted the officers' account that defendant possessed a weapon and fired it at

them. Thus, the officers' testimony was the lynchpin of the State's case; without it, there was insufficient evidence to convict.

¶ 61    Further, the State used the officers' testimony about the supposed "route" defendant took while running from and shooting at them to argue that the physical evidence supported his guilt. During closing arguments, the State said:

> "But wouldn't it be an incredible coincidence that the firearms evidence recovered in this case is exactly where Officers Chatman and Collier tell you the route that this event took, from the van, through the street, going westbound on the sidewalk, southbound through the street—the south side of the street.
>
> The evidence is consistent with exactly where Officer Collier and Chatman told you the route of the defendant and the officers took and where the shootings occurred.
>
> ***
>
> But this gun that was recovered hours later, ladies and gentlemen, testing a month after it was recovered, again, how could anybody have known that gun would come back to the firearm evidence that is in the street where the officer tells you the route [that] the defendant went? It goes to support exactly what the officers told you happened.
>
> ***
>
> The same gun that comes back to the firearm evidence that was recovered in this case that mirrors the route the defendant took."

¶ 62    However, if the officers' testimony regarding defendant's route was false, as attested to by Murdock and Baikie, then the State's argument linking the physical evidence to his route fails. Accordingly, we reverse the second-stage dismissal of defendant's subornation of perjury claim and remand for a third-stage evidentiary hearing.

-20-

¶ 63    Next, defendant argues that the postconviction court erred by dismissing his claim that his trial counsel provided ineffective assistance by failing to interview and call expert witnesses who would have contradicted Chatman and Collier's account of the shooting and supported the defense theory that the firearms evidence was from the earlier Wooden shooting. Defendant noted that two such experts were Murdock and Baikie, but defendant also argued that his trial counsel was ineffective for failing to conduct a "thorough investigation" of "relevant experts" other than Murdock and Baikie who "could have undermined both the evidence presented by the State and the theory that evidence allegedly supported."

¶ 64    To succeed on a claim of ineffective assistance, defendant must show that counsel's representation fell below an objective standard of reasonableness and that this substandard performance prejudiced defendant by creating a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *People v. Wheeler*, 401 Ill. App. 3d 304, 313 (2010). At the second stage of postconviction proceedings, defendant must present a substantial showing of counsel's ineffectiveness. *People v. Domagala*, 2013 IL 113688 ¶ 35.

¶ 65    The decision involving what evidence to present and which witnesses to call generally falls within the broad category of trial strategy and is not subject to a claim of ineffective assistance. *People v. West*, 187 Ill. 2d 418, 432-33 (1999). Still, an attorney may be deemed ineffective for failing to present exculpatory evidence, such as failing to call witnesses to support an otherwise uncorroborated defense theory. *People v. Harmon*, 2013 IL App (2d) 120439, ¶ 26. Also, trial counsel has the duty to conduct reasonable investigations into possible defenses. *Domagala*, 2013 IL 113688, ¶ 38. An attorney who fails to conduct a reasonable investigation cannot be said to have made decisions based on a valid trial strategy. *People v. Makiel*, 358 Ill. App. 3d 102, 107 (2005). "Whether the failure to investigate constitutes ineffective assistance of counsel is

determined by the value of the evidence not presented at trial and the closeness of the evidence that was presented at trial." *Harmon*, 2013 IL App (2d) 120439, ¶ 26.

¶ 66    In the instant case, defendant has made a substantial showing that his trial counsel was ineffective for failing to conduct a reasonable investigation into the availability of expert witnesses who would have supported the defense. The defense strategy at trial was to discredit Chatman and Collier's account of the shooting by arguing that the Ruger recovered from underneath the bush, which the State claimed defendant used to shoot at them, actually was involved in the earlier, unrelated shooting of Shawn Wooden on the same block and was never wielded by defendant. In support of this theory, the defense pointed to the lack of any gunshot residue testing or fingerprint evidence tying defendant to the Ruger, and to the witnesses who testified that defendant was only holding a soda pop bottle at the time of the shooting. Defense counsel called no expert witnesses to support the defense and to discredit Chatman and Collier's account of the shooting.

¶ 67    In his amended postconviction petition, defendant attached the affidavits of Murdock, the firearms expert, and Baikie, the crime scenes expert. Murdock attested that the officers' account of the shooting was inconsistent with where the firearms evidence was recovered. Baikie attested to the physical impossibility of Chatman's testimony that from his vantage point behind the automobile, he was able to see defendant point the Ruger at Collier.

¶ 68    Murdock and Baikie's affidavits, taken as true at these second-stage proceedings, articulate the potential value to the defense of investigating firearms and crime scene experts who would have supported the defense theory that Chatman and Collier were lying about defendant's participation in the shooting, and that the Ruger recovered from the bush was used in an earlier, unrelated shooting and not by defendant here. It appears from the record that neither Murdock nor Baikie would have been available themselves to testify at defendant's trial in 2007 as defense

witnesses, because at that time Murdock was working for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and Baikie was an investigator in the Cook County State's Attorney's office. However, according to defendant's amended postconviction petition, which again must be taken as true at the second stage, defense counsel's alleged ineffectiveness is premised at least in part on his failure to investigate whether any *other* "relevant experts" were available to testify that the location of the firearms evidence and an examination of the crime scene refuted Chatman and Collier's testimony at trial. Given the facts of this case, defendant has made a substantial showing that an objectively reasonable attorney would at least have investigated the availability of firearms and crime scene experts who, like Murdock and Baikie, would have examined the crime scene and the firearms evidence to determine the veracity of Chatman and Collier's testimony.

¶ 69    Given Murdock and Baikie's findings casting doubt on Chatman and Collier's testimony, as well as the corroborative findings of the independent investigation conducted by the Chicago Tribune, defendant has made a substantial showing of prejudice related to counsel's alleged failure to investigate the availability of expert testimony. Specifically, defendant has made a substantial showing of a reasonable probability that such an investigation would have uncovered firearms and crime scene experts who would have been available at trial to cast doubt on Chatman and Collier's testimony and on the State's theory that the Ruger was used by defendant, thereby changing the outcome of the trial. Accordingly, we reverse the court's second-stage dismissal of defendant's claim of ineffectiveness of trial counsel and remand for a third-stage evidentiary hearing.

¶ 70    Next, defendant argues that the postconviction court erred by dismissing his claims that his appellate counsel provided ineffective assistance on direct appeal. Appellate counsel is ineffective when their failure to raise an issue is objectively unreasonable and where there is a reasonable

probability that, had the issue been raised, the conviction or sentence would have been reversed. *People v. Mack*, 167 Ill. 2d 525, 532 (1995). Appellate counsel is not obligated to brief every conceivable issue on appeal, and counsel is not ineffective for refraining from raising issues which, in their judgment, are without merit, unless counsel's appraisal of the merits is patently wrong. *People v. Easley*, 192 Ill. 2d 307, 329 (2000). Thus, unless the underlying issues are meritorious, defendant has suffered no prejudice from counsel's failure to raise them on direct appeal. *Id.*

¶ 71    First, defendant contends his appellate counsel was ineffective on direct appeal for not raising the issue of his trial counsel's ineffectiveness for failing to move to exclude Jackson's testimony about the DNA results. Essentially, defendant's argument is that since the crime lab only tested six loci from the swabbed material recovered from the Ruger, the test results are unreliable for purposes of identity testing. Therefore, Jackson's testimony about the DNA results from the comparison of defendant's DNA to those six loci was irrelevant. Trial counsel should have moved to exclude Jackson's testimony and appellate counsel should have raised trial counsel's ineffectiveness for failing to make such a motion.

¶ 72    We find that defendant has failed to make a substantial showing of ineffective assistance of counsel, either at the trial or appellate level. Trial counsel made the strategic decision to challenge the DNA test results by cross-examining Jackson regarding her findings. Counsel elicited testimony from Jackson about the low level amount of DNA recovered from the Ruger, and about Jackson's inability to draw any conclusions about whether the swabs collected from the Ruger's left-side handle, trigger guard, magazine release and hammer spur matched defendant. Counsel further elicited testimony from Jackson as to how she only was able to obtain a partial DNA profile from the sample recovered from the right-side handle, safety lever, trigger guard and butt of the Ruger because only 6 out of a possible 14 loci had been tested. Jackson concluded that

defendant could not be excluded from having contributed to this sample, but she also admitted on cross-examination that defendant was one of about 600 million persons who could not be so excluded and that she could not say with a reasonable degree of scientific certainty that defendant handled the Ruger on the night of the shooting.

¶ 73    Defendant's cross-examination of Jackson was an objectively reasonable way of attacking the materiality/relevance of the DNA results and did not constitute ineffective assistance. Further, even if trial counsel had moved to suppress Jackson's testimony on relevancy grounds, defendant has not made a substantial showing that the motion would have been granted and/or that the result of the trial would have been different. Accordingly, defendant has failed to make a substantial showing of ineffectiveness of trial counsel and, in the absence of such a showing, his claim of ineffectiveness of appellate counsel necessarily fails.

¶ 74    Next, defendant contends his appellate counsel provided ineffective assistance on direct appeal by not raising the issue of his trial counsel's ineffectiveness for failing to move to exclude the Ruger on relevancy grounds, as there was insufficient evidence connecting the Ruger to defendant or to the shooting at issue. We find no substantial showing of ineffective assistance of either trial or appellate counsel. The State presented some evidence linking the Ruger to the shooting, through the forensic testimony about the recovery of cartridge cases and bullet fragments at the crime scene that were fired from the Ruger. The State presented some evidence linking the Ruger to defendant by presenting Jackson's testimony that defendant could not be excluded from having contributed to the mixture of DNA profiles found on the right-side handle, safety lever, trigger guard and butt. Given this evidence linking the Ruger both to defendant and to the shooting, trial counsel made the tactical decision that instead of moving to exclude the Ruger he instead would attack Jackson's findings on cross-examination and present evidence also linking the Ruger

to the earlier shooting of Wooden. Counsel's tactical decisions were not objectively unreasonable. Thus, defendant has failed to make a substantial showing of ineffectiveness of trial counsel, and in the absence of such a showing, his claim of ineffectiveness of appellate counsel necessarily fails.

¶ 75    Finally, defendant contends his appellate counsel provided ineffective assistance on direct appeal by failing to argue that the trial court erred by denying the defense motion to exclude Robinson's testimony that earlier in the day she had seen defendant show a gun under his shirt. Defendant argues that Robinson's testimony amounted to evidence that he had committed another crime (gun possession) and that such evidence of other crimes is irrelevant and inadmissible to establish defendant's propensity to commit crimes. See *People v. Cerda*, 2021 IL App (1st) 171433, ¶ 96.

¶ 76    Defendant has failed to make a substantial showing of ineffective assistance of appellate counsel, as the underlying issue (the court's alleged error in denying the defense motion to exclude Robinson's testimony) is not meritorious. The trial court denied the defense motion to exclude Robinson's testimony because it found that her testimony was relevant and admissible to show defendant's knowledge of the weapon and his opportunity/intent to use it. The court gave the jury Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000) informing the jury of the limited purpose for which Robinson's testimony may be considered. The court committed no abuse of discretion in so admitting Robinson's testimony and instructing the jury, where defendant's possession of the weapon only a few hours prior to the shooting was indeed relevant to show, not his general propensity to commit crimes, but that he had access to the gun and the opportunity, knowledge and intent to commit the shooting. See *Cerda*, 2021 IL App (1st) 171433, ¶ 97 and Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) (evidence of other crimes may be admissible

to establish proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident). As the trial court committed no abuse of discretion in admitting Robinson's testimony, appellate counsel committed no ineffective assistance by failing to raise the issue on direct appeal.

¶ 77     For all the foregoing reasons, we affirm the dismissal of defendant's claims of ineffective assistance of appellate counsel. We reverse the dismissal of defendant's claims of actual innocence, subornation of perjury, and ineffectiveness of trial counsel and remand for a third-stage evidentiary hearing thereon.

¶ 78     Affirmed in part, reversed in part, and remanded.

¶ 79     JUSTICE MARTIN, concurring in part and dissenting in part:

¶ 80     *Strickland* directs that we make every effort to eliminate "the distorting effects of hindsight." *People v. Peterson*, 2017 IL 120331, ¶ 88 (quoting *Strickland*, 466 U.S. at 689). But here, Smith's claim that his trial counsel was ineffective demands just that—to indulge in hindsight. Smith relies on two experts who examined the case long after his trial and their opinions are built on hindsight.

¶ 81     The majority's analysis focusses on "the value of the evidence not presented at trial and the closeness of the evidence that was presented at trial." *Supra* ¶ 65 (citing *Harmon*, 2013 IL App (2d) 120439, ¶ 13). Our precedent, however, indicates that this inquiry should only follow if the defendant first shows that counsel failed to conduct a reasonable investigation and develop a defense. See, *e.g.*, *Makiel*, 358 Ill. App. 3d at 107. Smith's petition and supporting affidavits fail to satisfy that threshold question.

¶ 82     The mere fact that counsel did not consult experts does not, alone, establish that counsel failed to conduct a reasonable investigation before trial. Expert testimony is called for when an

expert's specialized knowledge will "assist the trier of fact in understanding the evidence or in determining a fact at issue." (Internal quotation marks omitted.) *Todd W. Musburger, Ltd. v. Meier*, 394 Ill. App. 3d 781, 800 (2009). It may also be presented to address matters of common knowledge if the subject is difficult to understand and explain. *People v. Lerma*, 2016 IL 118496, ¶ 23.

¶ 83     In this case, it was apparent before trial that DNA and firearms evidence would be presented. But counsel could, and in fact did, develop the defense's theory of the case through cross-examination of the State's experts. As this court noted in his direct appeal, counsel "conducted a clear and effective cross-examination of the DNA expert." *Smith*, 2012 IL App (1st) 102354, ¶ 73. The record shows that the same is true for counsel's cross-examination of the State's firearms witness. Counsel's questioning evinced a knowledgeable command of the ballistic evidence, and he elicited testimony supporting that the Ruger had been fired in the earlier Shawn Wooden shooting. The record simply rebuts that counsel failed to conduct a reasonable investigation and develop a defense. Counsel presented a well-developed defense that could only have resulted from investigation of available evidence.

¶ 84     In contrast, both of Smith's proffered experts rely on information that was not available to trial counsel. Most notably, Robert Baikie concludes that Officer Chatman could not have viewed Smith at the doorway of 5331 West Congress Parkway based on Officer Chatman's trial testimony and a 2010 Chicago Tribune article. Smith fails to point to any evidence to show that trial counsel could have known Officer Chatman was "west of 5331" until he testified so on direct examination at Smith's 2007 trial. To be sure, counsel's cross-examination reveals that he was learning this for the first time. He asked Officer Chatman pointedly whether he could view Smith at the doorway from his location: "from your vantage point, you could see that?" Baikie's affidavit picks up from

Officer Chatman's trial testimony and finds evidence to rebut it. Trial counsel could not have done the same.

¶ 85    Likewise, John Murdock relies on the officers' trial testimony to opine that the location of recovered cartridge cases and bullet fragments are inconsistent with their account. Again, Smith fails to show any evidence that trial counsel could have ascertained this before trial. Like Baikie, Murdock picks up where the trial left off and, with the benefit of evidence adduced at trial, finds possible ways to rebut the State's case.

¶ 86    "[L]ack of investigation is to be judged against a standard of reasonableness given all of the circumstances, applying a heavy measure of deference to counsel's judgments." *People v. Kokoraleis*, 159 Ill. 2d 325, 330 (1994). When experts offer opinions based on posttrial hindsight, it does not render counsel's failure to consult them before trial unreasonable.

¶ 87    To satisfy *Strickland*'s first prong, a defendant must show "counsel's errors were so serious, and his performance so deficient, that he did not function as the 'counsel' guaranteed by the sixth amendment." *People v. Perry*, 224 Ill. 2d 312, 342 (2007). The deficiency Smith claims could not possibly rise to that level.

¶ 88    In sum, I disagree that Smith made a substantial showing that his trial counsel was ineffective for failing to present experts like Baikie and Murdock. Thus, I respectfully dissent from the majority's finding that his trial counsel was ineffective. I concur in all other aspects of the order.