2023 IL App (1st) 200423-U

No. 1-20-0423

Order filed July 31, 2023.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 5124 |
| | ) | |
| KEITH TALBERT, | ) | The Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Hyman concurred in the judgment.

**ORDER**

¶ 1     *Held*: Summary dismissal of defendant's postconviction petition is affirmed where defendant failed to raise an arguable claim of ineffective assistance of trial counsel based on counsel's failure to interview and procure testimony of a witness or to retain an expert witness.

¶ 2     Defendant Keith Talbert appeals the summary dismissal of his petition for relief filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). He argues that the circuit court erroneously dismissed his petition where he made an arguably meritorious claim of

ineffective assistance of trial counsel based on counsel's failure to (1) interview defendant's cousin, who the State argued instructed defendant to commit the crimes at issue, and (2) retain a trial expert to opine on the limitations of eyewitness testimony. For the following reasons, we affirm.

¶ 3    Following a 2014 jury trial, defendant was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2010) of Antonio Johnson, attempted first degree murder (720 ILCS 5/8-4(a) (West 2010)) of Annette Johnson, and aggravated discharge of a firearm in the direction of another person (720 ILCS 5/12-3.05(e)(1) (West 2010)). He was sentenced to a cumulative term of 100 years' imprisonment. This court affirmed on direct appeal. *People v. Talbert*, 2018 IL App (1st) 160157. Because we set forth the evidence in detail in that order, we recount them here only to the extent necessary to resolve the issues raised in this appeal.

¶ 4    Prior to trial, the trial court granted, over defendant's objection, the State's motion *in limine* to present evidence of Richard Talbert's prior contact with the Johnson-Wardlow family in order to show motive. The evidence was allowed for the purpose of showing that defendant committed the crimes at the behest of his cousin, Richard, following an ongoing conflict between Richard and the family.

¶ 5    In his opening statement, defense counsel argued that the State's eyewitnesses misidentified defendant as the shooter. Counsel further told the jury:

> "We'll present you with four witnesses. Three witness who were standing exactly in front of the house when the shooting took place. Two of these witnesses actually grew up with Antonio and were friends of his. Two of these witnesses actually saw the car and looked at the face of the shooter as this event took place.

These witnesses are coming here with detriment to their own lives. They know that once they go back on the street, there is no protection from the Court, there is no protection from the State. They are out there on their own.

They decided to come here for this trial in order to prevent the loss of two lives, Antonio and [defendant] himself."

¶ 6     At trial, Annette's daughter, Ashley Wardlow, testified that, on September 25, 2011, she and Annette returned to Annette's house after grocery shopping.[1] Ashley did not see anyone else in front of the house or across the street. She went inside and heard four or five gunshots coming from outside, with one bullet coming through the window. Annette said she had been shot in the arm. Antonio, on the porch, was unresponsive. Ashley called 911, and then spoke with an officer at the scene. Annette and Antonio were transported to the hospital.

¶ 7     Anthony testified that "boys" regularly sold drugs in front of the house in 2011. Richard wanted Anthony to sell drugs for him, but Anthony refused. Prior to the shooting, Richard had told Annette he would "do something to" Anthony. In early September 2011, Richard told the family, in front of Annette's house, that he was going to burn the house down; hours later, someone else set fire to the home.

¶ 8     After the fire, the drug sales continued. On September 25, 2011, Anthony and Antonio were outside the house when defendant, who had short dreadlocks at the time, drove by in a cream or beige Cadillac. Richard was in the front passenger's seat. Anthony had seen defendant around the neighborhood but did not know his name. Richard pointed at Anthony; it "look[ed] like"

---

[1]Because multiple witnesses share the same last name, we refer to certain witnesses by their first names.

Richard said to defendant, "that bitch-ass n*** right there." Defendant "[s]hook his head, like I got you." After the Cadillac drove away, Annette and Ashley returned home. The Cadillac returned five minutes later. Now alone in the car, defendant yelled, "[H]ey, Anthony, get your bitch-ass out here." Anthony looked at defendant, who pointed a gun through the car window and fired five or six shots, striking Antonio in the head and Annette in the arm.

¶ 9    Anthony gave the police a detailed description of the shooter and told them of the drug sales that had been taking place. On September 26, 2011, Anthony identified defendant as the shooter in a photo array and identified Richard as the man who had, shortly before the shooting, pointed Anthony out to defendant. On February 9, 2012, Anthony identified defendant in a lineup as the shooter, although his appearance had changed since the shooting.[2]

¶ 10    Annette testified that, prior to the shooting, she had asked Richard to stop sending minors to sell drugs in front of her house. The drug sales continued. Annette called 911, provided information to Detective James Sajdak, and allowed police to conduct surveillance from her attic. Richard repeatedly came to the house. In early September 2011, hours before the house was set on fire with family members inside, Richard argued with Anthony outside the house, and Richard said, "burn the bitch."

¶ 11    On September 25, 2011, after Annette and Ashley came home from the grocery store, she was speaking with her sons on the porch when she saw a brown-skinned young man with dreadlocks and "a scar in his eyebrow" pointing a gun at them from where he sat in the driver's

_____

[2]Based on our review of photographs admitted as exhibits at trial, defendant did not have dreadlocks when he appeared in the physical lineups.

seat of a car. He fired five or six shots, one of which hit Annette in the left arm. She fell to the ground and Antonio fell on top of her. Ashley called 911.

¶ 12    At the hospital, Annette told Detective David March what she had seen, including that the vehicle from which defendant was shooting was light-colored, possibly gray or beige. The next day, she identified defendant from a photo array as the shooter. On February 9, 2012, she identified him from a lineup as the shooter; he no longer had dreadlocks. In court, she identified defendant as the shooter and testified she had not seen him before the shooting.

¶ 13    March, a detective assigned to the shooting, testified that, when he arrived on the scene, Anthony described the shooter as a black man in his twenties, about six feet, one inch tall, with a medium complexion and dreadlocks. Anthony told March that he had seen the shooter in the neighborhood several times; that he fired eight or nine times from the older cream-colored, four-door Cadillac he was driving; and that, shortly before the incident, he had driven past the house with Richard. Anthony also told March his family had ongoing tensions with Richard.

¶ 14    When March interviewed Annette, she said that she recalled three or four shots being fired and believed the car was light-colored or gray. March obtained an arrest warrant. Defendant was arrested in Milwaukee and transported to Chicago on February 9, 2012, on which date Annette and Anthony each identified him in a physical lineup as the shooter.

¶ 15    Officer Matthew Gordon testified that only family members provided information at the scene, and that, in the area where the shootings occurred, "[s]ome" in the neighborhood "are reluctant" to offer information on criminal activity.

¶ 16    Detective Patrick Deenihan testified that, shortly after the incident, he went to the hospital and learned that Antonio was in critical condition. Annette gave a detailed description of the

shooting, describing the shooter as a thin black male with a medium complexion and dreadlocks who was driving a gray vehicle. Through investigation and a police database search, Deenihan learned that Richard and defendant were associated with the same residential address. Defendant's photograph was consistent with the descriptions of the shooter provided by Anthony and Annette. A photo array was prepared from which Anthony and Annette identified defendant as the shooter. From another photo array, Anthony identified Richard as the other individual in the car that drove by the house shortly before the shooting. Officers later learned the location of the subject vehicle from the Department of Revenue and towed it for processing.

¶ 17    Defense counsel presented four witnesses. Darrin Murdock, who was 16 years old at the time of the incident, testified that on the afternoon of the shooting she greeted Antonio while walking past the house. She testified that she was about three houses away, but also that she was around the corner, at the time of the shooting, and that after the shooting she went "back around the corner." She saw the vehicle, which was gray or silver, but not the driver. She had seen defendant in the neighborhood but did not know him. Anthony was known for having a "bad attitude." She left the area before the police arrived.

¶ 18    Murdock's mother, Nicole Payton, testified that she was walking home from the store shortly before the shooting when she saw Antonio with his mother and friend Tyler on the porch of the house and Anthony in the doorway. Payton ducked when the shooting occurred. She was unsure whether a red car that she saw passed before the shooting or after. She ran home and did not speak to the police. She had no issues with defendant and did not see him on the day of the shooting. She knew that Anthony "argued with a lot of people."

¶ 19    Khadijah Ricks testified that she was Murdock's sister and a friend of Antonio's. While walking with her mother, Payton, Ricks saw Antonio, Tyler, and Annette on the porch of the house and Anthony in the doorway. Ricks and Payton continued walking and encountered Murdock. After the shooting, Ricks ran home without looking back and did not see the shooter. She did not recall whether she saw any cars drive by. She did not come forward to talk to the police because she feared Anthony, whom she described as being "very angry" and as "always hav[ing] a mug on his face." Ricks knew defendant, but did not associate with him, and she did not see him on the date of the shooting.

¶ 20    Lukeba Wright testified she was at a bus stop when the shooting occurred. She ducked and saw a dark gray vehicle drive by. She did not know Antonio, Anthony, or defendant. After the shooting, she boarded a bus home. She had been reluctant to come to court, but had done so to avoid being subpoenaed or punished.

¶ 21    During closing argument, defense counsel noted that the four defense witnesses had been reluctant to be present for trial. Counsel noted that an officer testified that "people are not forthcoming" in the neighborhood; that Murdock heard the shooting and saw a gray car go by; and that Payton and Ricks did not see defendant or the car identified by Anthony and Annette at the time of the shooting. Counsel also stressed that witnesses saw a gray car, whereas the police identified a cream-colored car as the vehicle driven by defendant. Counsel further stressed that defendant did not have a scar near his eyebrow, which Annette testified the shooter had.

¶ 22    The jury found defendant guilty of first degree murder, attempted first degree murder, and aggravated discharge of a firearm.

¶ 23 Defendant retained new counsel and filed a motion for a new trial, arguing, in part, that his trial counsel was ineffective in failing to present the exonerating testimony of the four witnesses as promised in the opening statement. At the motion hearing, new counsel noted that the witnesses whom trial counsel called "did not support what the defense attorney promised the jury." The court observed that trial counsel "got flipped," explaining the witnesses told trial counsel "one thing" in advance of trial but said something different on the witness stand.

¶ 24 New counsel stated that he was not confident trial counsel had interviewed the defense witnesses before trial, that he had not spoken with the witnesses himself, and that he had reached out to trial counsel for their contact information. Defendant's new counsel suggested that trial counsel should have sought a sidebar or a recess "to interview the remaining witnesses instead of calling them one after the other to basically say we didn't see anything, we're not witnesses in the case, which is contrary to what [he] told the jury during opening statements." Asked by the court whether the defense witnesses had been identified in the police report as having been present, new counsel answered in the negative. The trial court denied defendant's motion for a new trial.

¶ 25 Defendant was sentenced to 100 years of imprisonment: 44 years for murder plus 25 years as an enhancement for personally discharging a firearm, to be served consecutively to a 31-year sentence for attempted murder but concurrently with a 15-year sentence for aggravated discharge of a firearm. The trial court denied his motion to reconsider sentence.

¶ 26 On direct appeal, defendant argued, in part, that his trial counsel had been ineffective in promising in his opening statement to present exonerating testimony and then failing to elicit it. *Talbert*, 2018 IL App (1st) 160157, ¶ 47. We affirmed, noting that the record supported the undisputed fact that the defense witnesses did not testify in the manner counsel promised, but did

not support a finding that counsel had failed to speak to and sufficiently investigate them. *Id.* ¶ 52. Furthermore, the fact that counsel opted to present witnesses who had not been named in the police report "strongly suggest[ed] that counsel did investigate those witnesses." *Id.* We concluded that, "[t]o the extent that defendant has evidence of trial counsel's alleged deficiency that exists outside the record," a postconviction petition under the Act "may provide a more appropriate means of seeking redress." *Id.*

¶ 27    On December 10, 2019, defendant filed a *pro se* postconviction petition under the Act. He alleged, *inter alia*, that trial counsel was ineffective in having failed to interview, investigate, or subpoena Richard in order "to refute the hearsay and speculative testimony offered by the prosecution." Additionally, defendant argued that trial counsel was ineffective for failing or refusing to retain an expert witness "to provide information to the jury about the scientific basis of various relevant aspects of perception and memory, to provide a tool for the jury to help assess the reliability of whatever eyewitness memory is relevant to the case."

¶ 28    Defendant attached to the petition a notarized affidavit dated November 18, 2019, in which he averred he was innocent of "the shooting of Antonio" and stated:

"I asked my attorney to look at cases where guys who were accused of a crime were later proven to be falsely identified. There was testimony from Annette Johnson that the shooter had a scar over his eye. She was very certain that the shooter had such a scar. I do not have any scars over either of my eyes. Richard was reluctant to get involved because he had some problems with Anthony in the past. I asked my attorney to talk to Richard and hear what he had to say about Anthony. Richard had information that Anthony had many enemies and was known to shoot at people from his front porch. My attorney always had

the same response, that he would look into the matter, or that we didn't need witnesses who would 'muddy the water.' "

¶ 29 The circuit court summarily dismissed defendant's petition on January 7, 2020. In its oral ruling, the court briefly addressed the sufficiency of the evidence. The court stated, in relevant part, that defendant's claims of ineffective assistance were unsupported and that the "quality" of the State's witnesses had been "well considered by the jury," as well by this court on direct appeal. The circuit court also stated that "[n]one of [the claims] show[ed] any cause or prejudice that would have affected the outcome of the case," and that the petition was "denied without merit."

¶ 30 We allowed defendant's motion for leave to file a late notice of appeal and ordered the appointment of appellate counsel.

¶ 31 On appeal, defendant argues that the circuit court erred in summarily dismissing his petition because he raised an arguable claim of ineffective assistance of trial counsel based on counsel's failures to (1) interview Richard, who had pertinent information about Anthony, and (2) retain an expert to opine generally on the limitations of eyewitness testimony.

¶ 32 The Act "provides a mechanism for criminal defendants to challenge their convictions or sentences based on a substantial violation of their rights under the federal or state constitutions." *People v. Morris*, 236 Ill. 2d 345, 354 (2010).

¶ 33 The Act establishes a three-stage process for adjudicating a postconviction petition. *People v. English*, 2013 IL 112890, ¶ 23. The circuit court here dismissed defendant's petition at the first stage of proceedings. At the first stage, the circuit court must determine whether the petition "is frivolous or is patently without merit" such that summary dismissal is warranted. 725 ILCS 5/122-2.1(a)(2) (West 2018).

¶ 34    One basis for summary dismissal is the defendant's failure to comply with section 122-2 of the Act, which provides that "[t]he petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2018). Failure to attach such materials may be "fatal" to a petition. *People v. Collins*, 202 Ill. 2d 59, 66 (2002). Noncompliance with section 122-2 may be excused, however, where the defendant's allegations are "uncontradicted and supported by the record." *People v. Harmon*, 2013 IL App (2d) 120439, ¶ 30 (citing *People v. Johnson*, 183 Ill. 2d 176, 191 (1998)). Summary dismissal is also warranted if the petition alleges only "nonfactual and nonspecific assertions that merely amount to conclusions." *People v. Morris*, 236 Ill. 2d 345, 354 (2010).

¶ 35    Otherwise, however, summary dismissal of a *pro se* petition is generally appropriate "only if the petition has no arguable basis either in law or in fact"—that is, when it is based on an indisputably meritless legal theory or a fanciful factual allegation. *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009). We review *de novo* the summary dismissal of a postconviction petition at the first stage (*People v. Tate*, 2012 IL 112214, ¶ 10) and may affirm the dismissal on any ground that appears in the record (*People v. Thompson*, 2022 IL App (1st) 1196604, ¶ 24).

¶ 36    In this court, defendant first argues the circuit court erred in summarily dismissing his petition because he set forth an arguable claim that his trial counsel was ineffective for failing to interview Richard, who, according to defendant's affidavit, had "problems with Anthony in the past" and "was reluctant to get involved," but had "information that Anthony had many enemies and was known to shoot at people from his front porch."

¶ 37    The State responds that summary dismissal of this claim was appropriate. Specifically, the State maintains that defendant's claim that his trial counsel's failure to call Richard arguably

resulted in prejudice is speculative because defendant failed to provide Richard's affidavit to demonstrate the substance of his testimony.

¶ 38    The right of effective assistance of trial counsel is constitutionally guaranteed. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting *Strickland* standard for challenges to effectiveness of both retained and appointed counsel); *People v. Rogers*, 2021 IL 126163, ¶ 23. Where a postconviction petition asserts ineffective assistance of counsel as the basis for relief, summary dismissal is not appropriate if it is at least "arguable" that both (1) counsel's performance fell below an objective standard of reasonableness, rendering his performance deficient, and (2) the defendant was prejudiced as a result. *Hodges*, 234 Ill. 2d at 17. "Prejudice" is deemed to result from counsel's deficient performance if "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Petrenko*, 237 Ill. 2d 490, 496-97 (2010) (quoting *Strickland*, 466 U.S. at 694).

¶ 39    After reviewing the record, we find that the circuit court did not err in summarily dismissing defendant's claim that trial counsel was ineffective for failing to interview Richard, because defendant cannot show that he was arguably prejudiced by counsel's actions where he did not support his claim with Richard's affidavit. As noted, section 122-2 requires that the petition include affidavits, records, or other evidence supporting its allegations or state why the same are not attached. 725 ILCS 5/122-2 (West 2018). An evidentiary affidavit pursuant to this provision serves not only to provide the petition's factual basis by showing the allegations to be "capable of objective or independent corroboration," but also to "identify with reasonable certainty the sources, character, and availability of the alleged evidence supporting" those allegations. (Internal

quotations omitted.) *People v. Allen*, 2015 IL 113135, ¶ 32 (citations omitted); see also *Collins*, 202 Ill. 2d at 67 (affidavits, records, or other evidence required by section 122-2 "shows that the verified allegations are capable of objective or independent corroboration").

¶ 40 Defendant did not attach Richard's affidavit to the petition or explain therein the reasons for its absence. Summary dismissal of a petition alleging ineffective assistance of trial counsel based on failure to interview a witness is appropriate where the defendant failed to supply an evidentiary affidavit of such witness. *People v. Enis*, 194 Ill. 2d 361, 380 (2000) ("A claim that trial counsel failed to investigate and call a witness must be supported by an affidavit from the proposed witness."); see also *People v. Harris*, 224 Ill. 2d 115, 142 (2007) (circuit court did not abuse its discretion in summarily dismissing petition; "[the d]efendant's affidavit was not sufficient to satisfy *Enis*'s requirement") (citing *Enis*, 194 Ill. 2d at 380). "In the absence of such an affidavit, a reviewing court cannot determine whether the proposed witness could have provided testimony or information favorable to defendant," rendering further review of the claim unnecessary. *Enis*, 194 Ill. 2d at 380.

¶ 41 Defendant nevertheless urges this court to excuse the absence of Richard's affidavit on the grounds that: defendant's own affidavit serves the statutory purpose of section 122-2 of the Code; defendant, "an indigent *pro se* defendant filing a petition from prison, *** cannot be expected to track down and interview Richard"; and the absence of Richard's affidavit can be "easily" rectified upon appointment of postconviction counsel for second stage proceedings. We disagree.

¶ 42 First, defendant's affidavit does not serve the statutory purpose that Richard's might. "[C]ommon sense dictates that a defendant's own affidavit is not at all objective or independent." *People v. Teran*, 376 Ill. App. 3d 1, 3-4 (2007). Second, defendant's incarceration does not excuse

the requirement. The Act applies to defendants "imprisoned in the penitentiary," and the provision governing supportive evidence recognizes no exception in the condition of incarceration. 725 ILCS 5/122-1; 122-2 (West 2018). Third, the possibility that postconviction counsel could in future obtain Richard's affidavit for second stage review does not remedy this court's *present* inability to undertake *first* stage review. See *Enis*, 194 Ill. 2d at 380.

¶ 43    We reject defendant's reliance on *People v. Johnson*, 154 Ill. 2d 227 (1993), wherein our supreme court recognized that appointed counsel filing an amended postconviction petition had, at second stage review, the obligation to attempt to obtain affidavits of witnesses named in a *pro se* petition. See *Johnson*, 154 Ill. 2d at 245. The supreme court did not consider whether, as relevant here, defendant's failure to attach such affidavits would have warranted summary dismissal at the first stage. See *id.* In the present case, defendant's failure to demonstrate that Richard would have testified in a manner useful to the defense by supplying his affidavit to this effect, or to explain its absence, warranted summary dismissal. 725 ILCS 5/122-2 (West 2018); *Enis*, 194 Ill. 2d at 380.

¶ 44    Defendant's second argument in support of his ineffective assistance claim is that his trial counsel failed or refused to retain an expert to opine on the limitations of eyewitness testimony. Defendant neither names nor provides an affidavit from such an expert, but asserts in his appellate brief that one "could have testified to" (1) "the low correlation between a witness' confidence and the accuracy of [the] identification," (2) the reduced reliability of an identification when a weapon is present (sometimes called "weapon focus"), (3) the impact of stress on memory, (4) the "inherent weaknesses in identifying strangers," and (5) the tendency of a "significant number" of eyewitnesses to reaffirm identification in a lineup after having falsely identified an innocent person from a photograph (known as "mugshot commitment").

¶ 45    In support of his argument, defendant points out that, by the time of his trial in late 2014, the fallibility of eyewitness testimony was widely recognized, and appellate courts had reversed convictions upon finding that trial courts abused their discretion in denying motions to admit expert testimony on the unreliability of eyewitness identification. See, *e.g.*, *People v. Navarro*, 2021 IL App (1st) 190483, ¶ 13 (noting supreme court's 1990 holding "that expert testimony on the issue of eyewitness identification was admissible in certain circumstances," such that "the claim that *** counsel was ineffective for failing to offer" such testimony "was available" at the time of direct appeal in 2007) (citing *People v. Enis*, 139 Ill. 2d 264 (1990)); see also *People v. Allen*, 376 Ill. App. 3d 511, 526 (2007) (remanding for new trial given the specific circumstances of the case and given the trial court's failure to engage in "careful scrutiny" or "meaningful inquiry into" proposed testimony of defense expert in eyewitness testimony).

¶ 46    In response, the State argues, first, that defendant forfeited any argument that trial counsel was ineffective in failing to call an expert, because he could have raised this issue on direct appeal, as it was evident that the State's case relied on eyewitness testimony.

¶ 47    In his reply brief, defendant counters that no forfeiture occurred, because trial counsel's "reasoning" for failing to call an expert is a "matter outside the record." See *People v. Brown*, 2014 IL App (1st) 122549, ¶ 41 (noting that "a postconviction claim that depends on matters outside the record *** is not ordinarily forfeited," because such matters could not have been raised on direct appeal) (citing *English*, 2013 IL 112890, ¶ 22).

¶ 48    We decline to find a forfeiture here. Postconviction proceedings are limited to "constitutional matters that have not been, nor could have been, previously adjudicated." *People v. Harris*, 224 Ill. 2d 115, 124 (2007). Thus, issues that could have been raised on direct appeal,

but were not, are generally forfeited in proceedings under the Act. *Petrenko*, 237 Ill. 2d at 499. However, the forfeiture doctrine is relaxed where the facts relating to the issue do not appear on the face of the original appellate record. *English*, 2013 IL 112890, ¶ 22. Our supreme court has recognized that the Act permits a defendant to assert a postconviction claim of ineffective assistance of counsel based on "the collection and presentation of 'affidavits, records, or other evidence' not contained in the record." *People v. Cherry*, 2016 IL 118728, ¶ 33 (quoting 725 ILCS 5/122-2 (West 2018)).

¶ 49    We find persuasive *People v. Pellegrini*, 2019 IL App (3d) 170827. In *Pellegrini*, the court reversed the dismissal of a postconviction petition following an evidentiary hearing at the third stage of proceedings at which two experts testified. *Id.* ¶¶ 36-38, 50. Where the petitioner alleged that trial counsel was ineffective in failing to retain the experts, the State argued that the defendant could have raised this claim on direct appeal. *Id.* ¶ 50. This court determined that defendant had not forfeited the claim, because it was "wholly based on information absent from the original appellate record, and thus could not have been raised on direct appeal." *Id.*

¶ 50    Similarly, here, the record is wholly silent as to the topic of any expert on eyewitness testimony. Therefore, we find that the rule of forfeiture is inapplicable.

¶ 51    The State alternatively argues that summary dismissal was proper because defendant's failure to identify an available expert who would testify on the matters he describes renders his claim wholly speculative.

¶ 52    Defendant replies that requiring him to identify an expert for postconviction proceedings places him in a "Catch-22," as there is "no conceivable way" he could have secured an expert through trial counsel who failed to investigate and retain one.

¶ 53     As noted, the failure to supply a potential witness's affidavit may constitute a failure to identify with reasonable certainty the sources and availability of evidence supporting the petitioner's allegations or to show the allegations capable of objective corroboration. *Allen*, 2015 IL 113135, ¶ 32. In an unpublished opinion, a panel of this court recently affirmed the summary dismissal of a postconviction petition where the defendant alleged that unnamed experts on firearms and the conduct of assault victims would have impeached the testimony of the State's witnesses, but failed to append affidavits of such experts to his petition. *People v. Williams*, 2022 IL App (1st) 200644-UB, ¶¶ 42-45 ("[The] defendant's failure to comply with the pleading requirements of section 122-2 of the Act is 'fatal' to his postconviction petition and alone justified the circuit court's summary dismissal.") (quoting *People v. Delton*, 227 Ill. 2d 247, 255 (2008)).[3]

¶ 54     However, whether the absence of an affidavit is fatal to a postconviction claim depends on the facts of the case. As noted, noncompliance with section 122-2 may be excused where the defendant's allegations are "uncontradicted and supported by the record." *Harmon*, 2013 IL App (2d) 120439, ¶ 30 (citing *Johnson*, 183 Ill. 2d at 191).

¶ 55     Accordingly, in *People v. Hayes*, 2022 IL App (1st) 190881-B, which defendant cites in his reply brief, this court reversed the summary dismissal of a postconviction petition alleging that counsel was ineffective in failing to investigate or call an expert who, according to the defendant, could have opined on the weaknesses in the testimony of the State's eyewitnesses. *Id.* ¶¶ 2, 36-37. This court, without addressing the defendant's apparent failure to name or supply an affidavit of such an expert, concluded that the record did not completely contradict the defendant's claim that

---

[3]Citing as persuasive authority pursuant to Illinois Supreme Court Rule 23(e)(1) (eff. Feb. 1, 2023) ("a nonprecedential order entered under subpart (b) of this rule on or after January 1, 2021, may be cited for persuasive purposes").

the proposed testimony of such an expert would have been relevant and admissible. *Id.* ¶ 36 (citing *Hodges*, 234 Ill. 2d at 16). This court could not discern "how, on first-stage review, a [circuit] court could say for sure how the [trial] court's discretion ought to have been exercised without further factual development as to the expert's proposed testimony." *Id.* Accepting the defendant's allegations as true, this court agreed that counsel should have investigated and sought admission of the expert, "given the facts" of the case. *Id.* ¶ 37.

¶ 56    However, the facts of *Hayes* are dissimilar to those in the case at bar. In *Hayes*, counsel presented an alibi defense, calling the defendant and two other witnesses to testify that he was with them at a party at the time of the shooting and did not leave the party until after the shooting. *Id.* ¶ 12. In postconviction proceedings, the defendant argued that the testimony of the eyewitness-identification expert would have "bolstered his alibi defense" while "undermin[ing]" the six eyewitnesses who testified for the State. *Id.* ¶ 22.

¶ 57    In contrast, here, defendant can make no such claim, where he did not raise an alibi defense and where he called his own eyewitnesses to the offense at trial. Defendant does not allege in these proceedings that counsel was ineffective in calling those eyewitnesses. Further, defendant failed to explain how, if the expert testimony would discredit the State's witnesses, it would not similarly discredit the defense eyewitnesses' testimony. Expert testimony regarding the unreliability of eyewitness testimony necessarily calls into question the fallibility of both the State and defense eyewitnesses. Counsel told the jury that two defense eyewitnesses looked at the shooter's face, suggesting they would testify they saw someone other than defendant shoot the victim. Although they did not do so, counsel's alleged ineffectiveness must be " 'evaluate[d] *** from counsel's perspective at the time' " of the allegedly deficient performance—here, pretrial decision-making—

and not " 'with the distorting effects of hindsight.' " *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 23 (quoting *Strickland*, 466 U.S. at 698).

¶ 58    This court is cognizant of our supreme court's admonition that "strategy" arguments are not an appropriate basis for summary dismissal (*Tate*, 2012 IL 112214, ¶ 22), constituting an exception to the general rule that matters of trial strategy are immune from claims of ineffective assistance (*People v. Jones*, 2023 IL 127810, ¶ 51 (citing *People v. Manning*, 241 Ill. 2d 319, 327 (2011))). However, in *Tate*, the defendant argued that counsel was ineffective in not calling alibi witnesses and an eyewitness, not an expert on eyewitness identification, and the record did not present a scenario suggesting the proposed testimony of those witnesses would have undermined any aspect of the defense. *Tate*, 2012 IL 112214, ¶¶ 3-5. Furthermore, unlike defendant herein, the defendant in *Tate* appended to his petition the affidavits of the proposed witnesses whose testimony he sought to introduce. *Id.* ¶ 4.

¶ 59    Here, defendant describes general areas of proposed expert testimony on the infirmity of eyewitness observations, but fails to specify what, at the time of the failures that allegedly rendered counsel's performance ineffective, counsel should have reasonably expected the expert to have opined as to any aspect of any eyewitness's testimony. Our supreme court, in reviewing the denial of a defense motion to allow expert testimony on eyewitness identifications, observed that such testimony is relevant and appropriate where "the State's case against defendant hangs 100% on the reliability of its eyewitness identifications" and neither a confession nor physical evidence ties the defendant to the offense. *People v. Lerma*, 2016 IL 118496, ¶ 26 (circuit court abused its discretion in denying the defendant's motion). The State's case was similar here. However, where four of the six eyewitnesses were called by the defense, where counsel's decision to call them is

unchallenged in these postconviction proceedings, and where defendant fails to provide an expert affidavit or to otherwise allege the impact of the expert's testimony on the credibility of any of them, we cannot conclude that counsel's failure to retain such an expert arguably rendered counsel's performance deficient or prejudiced defendant. See *Hodges*, 234 Ill. 2d at 17.

¶ 60 Nor can we conclude that counsel's performance was arguably deficient in that he failed to *investigate* such an expert, given that, " '[w]here circumstances known to counsel at the time do not reveal a sound basis for further inquiry in a particular area, it is not ineffective for the attorney to forgo additional investigation.' " *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 39 (quoting *People v. Williams*, 2017 IL App (1st) 152021, ¶ 38). As noted, counsel's decision to call the defense eyewitnesses is unchallenged, and the relevant time for assessing the potential deficiency of counsel's performance is the time of the alleged failure and not in hindsight. *Fields*, 2017 IL App (1st) 110311-B, ¶ 23 (citing *Strickland*, 466 U.S. at 698).

¶ 61 Finally, we consider defendant's contention that the circuit court improperly applied a "cause and prejudice" standard in noting, in the summary dismissal order, that none of defendant's claims "show[ed] any cause or prejudice that would have affected the outcome of the case." As defendant notes, it is only in seeking leave to file a *successive* postconviction petition that the defendant must show "cause" for his failure to raise the claim in the original petition, and "prejudice" resulting from such failure. 725 ILCS 5/122-1(f) (West 2018); *People v. Smith*, 2014 IL 115946, ¶ 33.

¶ 62 However, we discern from the record no misapprehension by the circuit court that the petition under consideration was a successive one and conclude that the court misspoke. In any event, such an error by the circuit court would not affect our ruling because, in reviewing the

summary dismissal *de novo*, we afford "no deference to the postconviction court's judgment or reasoning." *People v. Johnson*, 2021 IL 125738, ¶ 28 (citing *People v. Vincent*, 226 Ill. 2d 1, 14 (2007)).

¶ 63    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 64    Affirmed.